CONSUMER FEDERATION OF
AMERICA et al., Petitioners,

v.

FEDERAL POWER COMMISSION,
Respondent,

The Public Service Commission for the
State of New York et al.,
Intervenors.

No. 73–2009.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 26, 1974.

Decided March 13, 1975.

Charles F. Wheatley, Jr., Washington, D. C., with whom Edward Berlin, Washington, D. C., was on the brief, for petitioners.

William J. Grealis, Atty., Federal Power Commission for respondent. Leo E. Forquer, Gen. Counsel, Federal Power Commission, George W. McHenry, Jr., Solicitor and William M. Sawyer, Atty., Federal Power Commission were on the brief for respondent.

Christopher T. Boland, Washington, D. C., with whom Robert G. Hardy and Thomas F. Ryan, Jr., Washington, D. C., were on the brief for intervenors Texas Gas Transmission Corp. and Transcontinental Gas Pipe Line Corp.

Frederick Moring, Richard G. Morgan and Stephen J. Small, Washington, D. C., were on the brief for intervenor Associated Gas Distributors.

Richard A. Solomon, Washington, D. C., entered an appearance for intervenor Public Service Commission of the State of New York.

Robert A. Jablon entered an appearance for Senators Humphrey, McGovern, Metcalf, Moss, Mondale and Proxmire and Representatives Aspin, George Brown, Eckhardt, Fraser, Moss and Reid as amicus curiae.

Before DANAHER, Senior Circuit Judge, and LEVENTHAL and WILKEY, Circuit Judges.

LEVENTHAL, Circuit Judge:

Petitioners seek review of 1973 Federal Power Commission orders, Order 491 and its supplements, which were based on projected gas shortages during the 1973–74 winter heating season. The challenged orders, for convenience referred to collectively as Order 491, exempted from the certification requirement of section 7 of the Natural Gas Act sales of 180 days duration made to pipelines experiencing or facing threatened curtailment of service. Under the 180 day exemption, producers were permitted to enter into contracts with eligible pipelines at any price and without risk of subsequent refund orders.[1] The FPC proposed to protect the consumer by allowing pipelines to pass on only those purchased gas costs "shown to have been required by the public interest."[2]

Petitioners contend that the 180 day exemption constitutes an impermissible deregulation of producer sales in violation of the "just and reasonable" rate requirement of §§ 4 and 5 of the Act and the requirement of § 7 that new

---

1. *See* Order No. 491–B, November 2, 1973, at 14.

2. *Id.* at 13.

sales and service are permitted only under a certificate that they further the public convenience and necessity.[3] The Commission responds that its order is a proper exercise of its power under § 7(c) to exempt "temporary acts or operations" from the § 7 certification requirement.[4] We conclude that the Commission has stretched unduly its narrow § 7 exemption authority and has failed to establish a valid scheme of indirect regulation. Accordingly, we set aside the challenged orders. For the reasons set forth in part IV of the opinion, we remit petitioners' refund request for FPC consideration in the first instance.

## I. BACKGROUND

An FPC staff survey revealed in 1970 that adequate gas supplies might not be available for the 1970–71 winter heating season.[5] In response to the anticipated shortfall, the Commission adopted Order 402, May 6, 1970, authorizing intrastate distribution companies to make 60 day resales of gas to jurisdictional pipelines without FPC approval or risk of becoming a "natural gas company" subject to Commission regulation.[6] Subsequently, the Commission issued Order 418 which modified regulations to permit 60 day purchases from independent producers "where an emergency exists on the pipeline's system."[7] The FPC noted in April, 1971, that despite "these emergency measures" a number of pipelines were unable to meet their firm demands.[8] In order to forestall emergencies during the

next winter the Commission in Order 431 extended the 60 day exemption and decided to "consider limited-term certificates with pre-grant abandonment, if the pipeline demonstrates emergency need."[9] None of these early measures were challenged in the courts.[10]

Another staff study of gas supplies, released July 16, 1973, projected "net curtailments of firm requirement customers of the major interstate pipelines" of 1.2 trillion cubic feet (tcf) during the April, 1973, to March, 1974, period with a .5 tcf shortfall during the 1973–74 winter.[11] The study found "reliable and adequate gas service even more jeopardized than at the juncture when [the Commission] initiated emergency measures" in 1970.[12] Concluding that further steps were necessary to prevent "severe economic and environmental consequences," the Commission, without notice or opportunity for comment, issued Order 491 on September 14, 1973.[13] The order exempted from § 7's certification requirement emergency sales, if deliveries commenced before March 15, 1974, even though they ran for a period as long as 180 days. Order 491 also suspended the limited-term certificate procedure of Order 431 "pending further study and order of the Commission."[14]

On September 20, petitioners—Consumer Federation of America, American Public Gas Association and National League of Cities-United States Conference of Mayors[15]—sought leave to inter-

---

3. *See* Brief for Petitioners at 28.

4. *See* Brief for Respondent at 23.

5. *See* Order 431, 45 FPC 570, 571 (1971).

6. 43 FPC 707 (1970) (Adding new section 2.68 to the FPC's Statement of General Policy and Interpretations under the Natural Gas Act).

7. 44 FPC 1574 (1970) (amending 18 C.F.R. §§ 157.22 and 157.29).

8. *See* Order 431, 45 FPC 570, 571 (1971).

9. *Id.* at 572.

10. *See* Order 491–A, 50 FPC 848, 853 (1973).

11. *See* Order 491, 50 FPC 742, 743 (1973).

12. *Id.*

13. *See id.* at 742–743.

14. *See id.* at 744–45.

15. Briefs in this case have also been filed by Intervenors Texas Gas Transmission Corp. and Transcontinental Gas Pipe Line Corp. (Pipeline Intervenors), Intervenor Associated Gas Distributors, and a group of Senators and Representatives acting as *amicus curiae.*

 *Amicus curiae,* like petitioners, urges us to set aside Order 491. The intervenors address only portions of the order under review. The Pipeline Intervenors support the 180 exemption but claim that the Commission lacks the authority to prevent pipelines from passing on to consumers "purchased gas expenses resulting from contracts entered into at 'arm's

vene and moved for rehearing and a stay of Order 491. Next day they filed a motion for stay in this court, claiming that the Commission's order had been adopted in violation of the Administrative Procedure Act and the Natural Gas Act.[16] The FPC denied petitioners' stay application in Order 491–A, September 25, 1973.[17] This order presented a more detailed picture of the projected curtailments and explained that the 180 day period was necessary "to obtain sufficient commitments for this winter heating season." [18] In addition, the Commission announced that it would allow interested parties to file comments. This court heard oral argument on petitioners' motion and, on October 3, 1973, stayed Order 491 pending Commission reconsideration after receipt of comments.[19]

The FPC's Order on Reconsideration, Order 491–B, November 2, 1973, reaffirmed its decision to expand the emergency sales exemption to 180 days and reinstituted the limited-term certificate procedure. Petitioners applied to the FPC for a rehearing and stay of Order 491–B and moved in this court for an extension of the October 3 stay pending resolution of their petition for review. The Commission denied the rehearing and stay requests in Order 491–C, November 21, 1973. We then granted a stay of Order 491–B pending judicial re-view. Ten days later, on December 20, 1973, the Supreme Court granted the Solicitor General's application to vacate our stay.

*Live Controversy*

■ Although all sales under Order 491 have been completed, the present controversy remains alive. Following the Supreme Court's action, the Order 491 procedures were available for sales to pipelines facing curtailment until terminated by Order 491–D on March 15, 1974. Between September 1973 and September 1974 over 500 sales, involving more than 172 billion cubic feet (172,000,000 mcf) of natural gas were exempted under the challenged orders.[20] Petitioners not only request that we set aside the expired orders but also seek refunds of rates paid producers in excess of the just and reasonable rate.[21] The limited duration of the orders combined with the continuing gas shortage make this controversy one "capable of repetition, yet evading review." [22] Indeed, while this case was pending the Commission advised that it was considering reinstating the 180 day exemption for the 1974–75 season.[23]

## II. SCOPE OF THE SECTION 7(c) PROVISO

Section 7 of the Natural Gas Act [24] requires that a natural gas company ob-

---

length' and in good faith." Brief for Pipeline Intervenors at 3. Intervenor Associated Gas Distributors defends only the 180 day exemption of emergency sales, exchanges and deliveries between distribution companies exempt from FPC regulation and interstate pipelines or distribution companies in other states. *See* note 86 *infra*.

16. *See* Motion for Stay at 1, Sept. 21, 1973; Brief *for* Petitioner at 11.

17. 50 FPC 848 (1973).

18. *See id.* at 852.

19. Brief for Petitioners at 12.

20. *See* Order Directing Solicitor to seek an Expedited Decision in the Appeal of Orders No. 491, et seq., at 6, Jan. 16, 1975.

21. Brief for Petitioners at 13.

22. *See* Roe v. Wade, 410 U.S. 113, 125, 93 S.Ct. 705, 713, 35 L.Ed.2d 147 (1973), *quoting* Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911).

23. *See* Motion for Expedited Decision at 3–4, Jan. 17, 1975.

24. Section 7 of the Natural Gas Act, 15 U.S.C. § 717f (1970), provides in pertinent part:

(c) No natural-gas company or person which will be a natural-gas company upon completion of any proposed construction or extension shall engage in the transportation or sale of natural gas, subject to the jurisdiction of the Commission, or undertake the construction or extension of any facilities therefor, or acquire or operate any such facilities or extensions thereof, unless there is in force with respect to such natural-gas company a certificate of public convenience

tain a certificate of public convenience and necessity prior to engaging in the transportation or sale of natural gas in interstate commerce. Application for a certificate "shall be denied" unless the Commission after notice and hearing finds that the proposed sale or service "is or will be required by the present or future public convenience and necessity."[25] The FPC premised its decision "to exempt emergency purchases from regulation for 180 days" on a proviso in § 7(c) containing an exception to the general certification requirement.[26] The proviso states:

> *Provided, however,* That the Commission may issue a temporary certificate in cases of emergency, to assure maintenance of adequate service or to serve particular customers, without notice or

and necessity issued by the Commission authorizing such acts or operations: *Provided, however,* That if any such natural-gas company or predecessor in interest was bona fide engaged in transportation or sale of natural gas, subject to the jurisdiction of the Commission, on February 7, 1942, over the route or routes or within the area for which application is made and has so operated since that time, the Commission shall issue such certificate without requiring further proof that public convenience and necessity will be served by such operation, and without further proceedings, if application for such certificate is made to the Commission within ninety days after February 7, 1942. Pending the determination of any such application, the continuance of such operation shall be lawful.

In all other cases the Commission shall set the matter for hearing and shall give such reasonable notice of the hearing thereon to all interested persons as in its judgment may be necessary under rules and regulations to be prescribed by the Commission; and the application shall be decided in accordance with the procedure provided in subsection (e) of this section and such certificate shall be issued or denied accordingly: *Provided, however,* That the Commission may issue a temporary certificate in cases of emergency, to assure maintenance of adequate service or to serve particular customers, without notice or hearing, pending the determination of an application for a certificate, and may by regulation exempt from the requirements of this section temporary acts or operations for which the issuance of a certificate will not be required in the public interest.

hearing, pending the determination of an application for a certificate, and may by regulation exempt from the requirements of this section temporary acts or operations for which the issuance of a certificate will not be required in the public interest.

The Commission puts it that "there is nothing in the legislative history . . which is helpful to the interpretation of the Commission's exemption authority," and that "the clear language of Section 7(c) and the overall purposes of the Act" supports its reliance on the proviso.[27] Our analysis of the legislative history and statutory framework leads to a contrary conclusion.

## A. *Legislative History*

■ In our view, the legislative history lends considerable insight into the in-

(d) Application for certificates shall be made in writing to the Commission, be verified under oath, and shall be in such form, contain such information, and notice thereof shall be served upon such interested parties and in such manner as the Commission shall, by regulation, require.

(e) Except in the cases governed by the provisos contained in subsection (c) of this section, a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operation, sale, service, construction, extension, or acquisition covered by the application, if it is found that the applicant is able and willing properly to do the acts and to perform the service proposed and to conform to the provisions of this chapter and the requirements, rules, and regulation of the Commission thereunder, and that the proposed service, sale, operation, construction, extention, or acquisition, to the extent authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied. The Commission shall have the power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require.

**25.** Section 7(e) of the Natural Gas Act, 15 U.S.C. § 717f(e) (1970).

**26.** *See* Order 491–B, *supra* note 1, at 10.

**27.** Brief for Respondent at 16–17.

tended scope of the proviso. It was designed as a narrow exception to enable the companies and the Commission to grapple with temporary emergencies and minor acts or operations, like emergency interconnections to cope with breakdowns or sporadic excess demand for gas.

The proviso was adopted as part of an amendment to § 7 passed in 1942.[28] An amendment was sought to remedy deficiencies in § 7(c) as enacted in 1938.[29] The 1938 law required certificates of public convenience and necessity only when natural gas companies proposed to enter "a market in which natural gas is already being served by another natural-gas company."[30] That provision, the FPC concluded, "has proved unsatisfactory and ineffective to protect the public interest."[31] The House Report proposing to drop the original limitation noted that it would fill the regulatory gap by "giving the Commission an opportunity to scrutinize the financial set-up, the adequacy of the gas reserves, the feasibility and adequacy of the proposed services, and the characteristics of the rate structure in connection with the proposed construction or extension at a time when such vital matters can readily be

modified as the public interest may demand."[32]

The proviso now relied upon by the FPC was not in the initial draft of the 1942 proposal (H.R. 4819),[33] but surfaced later as one of the two modifications prompted by gas company suggestions. In the House hearings, FPC Commissioner Manly referred to these modifications as "two slight amendments."[34] The only other reference to the proviso, in a letter of FPC Chairman Olds responding to a Committee request for an analysis of the bill, stated that the "language . . . was put in the bill primarily to provide for emergency interconnections of pipe lines, which are sometimes necessary to make it possible to maintain adequate service in cases of extraordinary peak demands, break-downs, and so forth."[35]

Other discussion focused on the temporary certificate clause of the one-sentence provisio. That clause initially read: "[T]he Commission may issue a temporary certificate in cases of emergency, without notice and hearing, pending the determination of an application for a certificate."[36] During consideration of the bill, the clause was amended by adding after "emergency", "to assure

---

**28.** 56 Stat. 83 (1942).

**29.** See H.R.Rep.No.1290, 77th Cong., 1st Sess. 1–2 (1941). The Supreme Court has noted that the 1942 amendment "broadened" the protection provided consumers by adding the § 7 certificate requirement to its "rate-making regulatory tools." See FPC v. Hunt, 376 U.S. 515, 525–26, 84 S.Ct. 861, 11 L.Ed.2d 878 (1964); FPC v. Hope Natural Gas Co., 320 U.S. 591, 611–12, 64 S.Ct. 281, 88 L.Ed. 333 (1944).

**30.** See 52 Stat. 825 (1938). This limiting language reflected Congress's concentration on the prevention of economic waste involved in duplication of service. See Letter, note 31 infra, at 81.

**31.** Letter from Leland Olds, Chairman, Federal Power Commission, to Clarence F. Lea, Chairman, Committee on Interstate and Foreign Commerce, Aug. 2, 1941, reprinted in Hearings on Natural Gas Act Amendments Before the House Comm. on Interstate and Foreign Commerce, 77th Cong., 1st Sess., at 81 (1941).

The deficiencies were twofold—(1) The FPC had to shoulder "long and tedious proceedings

to determine" the relevant market, and whether there was existing service, "before the merits of the case [could be] considered." Hearings, supra, at 3 (statement of FPC Commissioner Basil Manly). See H.R.Rep.No.1290, supra note 29, at 2; Letter, supra, at 81. (2) for areas not previously serviced by a natural gas company, the provision allowed "unregulated competition in extensions and even economic waste in construction of new interstate gas pipe lines." H.R.Rep.No.1290, supra note 29, at 2. Letter, supra, at 81–82.

**32.** See H.R.Rep.No.1290, supra note 29, at 2–3.

**33.** The only exception in H.R. 4819 was a grandfather clause granting a certificate upon application to all natural gas companies engaged in transportation or sale on the date of the amendment. See § 7(c), 15 U.S.C. § 717f(c) (1970).

**34.** See Hearings, supra note 31, at 18.

**35.** See Letter, supra note 31, at 82.

**36.** See H.R. 5249, reprinted in Hearings, supra note 31, at 1.

maintenance of adequate service or to serve particular customers." [37] Both the FPC Chairman and the final House Report explained that the change was made "to limit the authority for granting a temporary certificate to emergency situations involving only a comparatively minor extension of the facilities of an existing system." [38] Relying on this history, we have held that the temporary certificate provision was intended to reach only "a narrow class of situations" involving interconnection or expansion of facilities to respond to "breakdowns in the service of operating natural gas companies, or sudden unanticipated demands." [39].

■ The FPC urges that we must disregard the legislative history and judicial interpretations of the temporary certificate clause because the Commission enacted Order 491 under the exemption clause. [40] This we cannot do, for logic and history make it clear that the two clauses are intertwined. They have been joined since birth in a one-sentence proviso, both part of a single "slight amendment" to a bill that was overall an extension of the certification requirement to "all cases as a condition precedent to engaging in transportation or sale of natural gas subject to the jurisdiction of the Commission." [41]

■ We see no sound basis for concluding that the FPC has distinctively greater scope or authority to withdraw from the certificate requirement by invoking the exemption clause rather than the temporary certificate clause of this one-sentence proviso. [42] If anything, the purpose, text and history of the proviso run the other way. The primary purpose of Congress was to emphasize the public interest in permanent certification hearings as a condition for new gas operations. With the temporary certificate clause the Commission merely provides interim operating authority pending the completion of the hearings. That temporary authority is not without significance, for it provides a "momentum which tends to perpetuate the temporary into the enduring." [43] Still, it does not scrap the hearings. In contrast, the exemption clause, when used, dispenses with certification hearings entirely. It was inserted for minor "temporary acts and operations" for which a hearing would be superfluous. [44] The exemption clause is not a broad blade to cut a wide swath out of the basic landscape of certification after due hearings. What it permits is a more modest kind of pruning, like the temporary certificate available for emergency trimming pending hearings. [45]

37. *See* H.R.Rep.No.1290, *supra* note 29, at 1, 5.

38. *See id.* at 5; Letter, *supra* note 31, at 83–84.

39. Pennsylvania Gas and Water Co. v. FPC, 138 U.S.App.D.C. 298, 304, 427 F.2d 568, 574 (1970). *Compare* Algonquin Gas Transmission Co. v. FPC, 201 F.2d 334, 339–41 (1st Cir. 1953).

40. Brief for Respondent at 16–17.

41. *See* H.R.Rep.No.1290, *supra* note 29, at 2.

42. That the exemption clause should not be broadened beyond the temporary certificate clause is underscored by the consideration that with an exemption clause the FPC removes the possibility, available in the case of a temporary certificate, of inserting a salvaging condition in the permanent certificate "as the public convenience and necessity may require." Section 7(e) of the Act; 15 U.S.C. § 717f(e) (1970). Even where an unconditional temporary certificate has been granted, the FPC may protect the public by ordering producers to refund amounts collected in excess of the permanent certificate rate approved after notice

and hearing. *See* FPC v. Sunray DX Oil Co., 391 U.S. 9, 45, 88 S.Ct. 1526, 20 L.Ed.2d 388 (1968).

43. *See* Pennsylvania Gas and Water Co. v. FPC, 138 U.S. App.D.C. 298, 304, 427 F.2d 568, 574 (1970). The court went on to note that, although there is "latitude for agencies to expedite hearings in the public interest," "only a narrow class of real 'emergency' cases justifies the taking of action such as temporary certificates on an informal examination of the file without opportunity for hearing." *Id.* at 306, 427 F.2d at 576.

44. As the Supreme Court noted in FPC v. Hunt, 376 U.S. 515, 520, 84 S.Ct. 861, 11 L.Ed.2d 878 (1964), the provision for temporary certificates in certain cases reflected Congress' understanding of the time consuming nature of permanent certification hearings. *See* Pennsylvania Gas and Water Co. v. FPC, 138 U.S.App.D.C. 298, 304, 427 F.2d 568, 574 (1970).

45. The limited role of a disposition without any hearing is underscored by the fact that the

In this case, we are reviewing an order expressly intended to elicit large volume sales.[46] The exemption it provided extended to all producers, and authorized sales of unlimited quantities of gas for a period that is not merely half the calendar year but spans an entire heating season. At a time when curtailment and shortages are projected for the foreseeable future, the Commission's 1973–74 position is tantamount to a claim of authority to continue this vast 180 day exemption indefinitely. It may be that an exemption should be authorized by the legislature, or that even without modification the Commission may have authority to institute a program upon due determination, after § 7 hearings of a need for certification in the public interest. Those questions are not before us. What we can say, and do say, is that the legislative history makes plain that it was never contemplated that the modest emergency provisio in § 7 for orders without hearings would be employed to excise large-volume, long-duration, widespread deliveries of gas.

## B. *Purpose of the Section 7 Certificate Requirement*

Our divergence from the FPC's analysis pertains not only to legislative history, which FPC finds barren and we find meaningful, but also to purpose. In our view, the FPC's interpretation is undercut, rather than underscored, when consideration is given to the purpose of § 7 and its relationship to the overarching goals of the Act. The prior decisions discussing § 7 support our view.[47]

The original Act expressly declared in § 7(c) that it was "the intention of Congress that natural gas shall be sold in interstate commerce for resale for ultimate public consumption for domestic, commercial, industrial, or any other use at the lowest possible reasonable rate consistent with the maintenance of adequate service in the public interest."[48] The 1942 amendments to § 7 "were not intended to change this declaration of purpose,"[49] but to remove impediments to its realization.

The Supreme Court's 1959 opinion in Atlantic Refining Co. v. Public Service Comm'n (CATCO)[50] contains the most

requirement of a hearing is not a requirement of futile or obstructive hearings. The courts have made it plain that even when proceedings are of such a type that hearings are required generally, they are not required in particular cases or for particular issues where there are no substantial issues of fact, and that even where oral hearings are required they may be conducted with foreshortened procedure, especially situations that call for expedition, so as to focus on the main points that merit oral ventilation. Weinberger v. Hynson, Westcott & Dunning, Inc., 412 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973); Marine Space Enclosures, Inc. v. FMC, 137 U.S.App.D.C. 9, 420 F.2d 577 (1969); Citizens for Allegan County, Inc. v. FPC, 134 U.S.App.D.C. 229, 414 F.2d 1125 (1969).

**46.** Under the Order 491 procedure over 500 sales involving more than 172,000,000 mcf of gas were exempted from the certification requirement. Data on sales during the first 12 working days under the 180 day exemption reveal that the average price of 54.4¢ per mcf. See Comptroller General sold at as much as 60¢ per mcf. Reports spanning a larger portion of the Order 491 sales showed an actual weighted average price of 54.4¢ per mcf. See

Comptroller General of the United States, Need for Improving the Regulation of the Natural Gas Industry and Management of Internal Operations 16–17 (1974).

**47.** *See, e. g.,* FPC v. Sunray DX Oil Co., 391 U.S. 9, 16–20, 36–37, 88 S.Ct. 1526, 20 L.Ed.2d 388 (1968); FPC v. Hunt, 376 U.S. 515, 519–527, 84 S.Ct. 861, 11 L.Ed.2d 878 (1964); Atlantic Refining Co. v. Public Service Comm'n, 360 U.S. 378, 388–92, 79 S.Ct. 1246, 3 L.Ed.2d 1312 (1959); Continental Oil Co. 1 v. FPC, 378 F.2d 510, 517–18 (5th Cir. 1967), cert. denied, 391 U.S. 918, 88 S.Ct. 1801, 20 L.Ed.2d 655 (1968); Public Service Comm'n v. FPC, 117 U.S.App.D.C. 287, 290–92, 294, 329 F.2d 242, 245–247, 249, cert. denied, 377 U.S. 963, 84 S.Ct. 1644, 12 L.Ed.2d 735 (1964); *See also* FPC v. Texaco, Inc., 417 U.S. 380, 386–87, 394, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974).

**48.** 52 Stat. 825 (1938), *quoted in Atlantic Refining Co., supra* note 47, 360 U.S. at 388, 79 S.Ct. 1246.

**49.** *Atlantic Refining Co., supra* note 47, at 388 n. 7, 79 S.Ct. at 1253.

**50.** 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed.2d 1312 (1959).

comprehensive explication of how the statutory sections interrelate to protect purchasers of natural gas from excessive rates.[51] It found that "the initial certificating of a proposal under § 7(e)" was "crucial" to the functioning of the Act, given § 5's marginal value in redressing initial certified rates stemming from its "interminable" delays and only prospective impact.[52] The Court concluded that § 7 imposed a duty upon the Commission to engage in "a most careful scrutiny and responsible reaction to initial price proposals of producers." That scrutiny demands attentiveness to the evidence presented by the producer with "price a consideration of prime importance" in the application of the public convenience and necessity standard.[53]

■ It is the clear teaching of CATCO and its progeny that preservation of the statutory scheme depends on diligent enforcement of the § 7 certification requirement as a holding operation on initial rates. Any interpretation of the § 7(c) proviso that would empower the FPC to exempt the sale of large quantities of gas from the certification process would be antithetical to this basic purpose of the statutory framework.

■ The FPC's brief argues that CATCO only requires a close scrutiny of rates for sales that require a certificate.[54] What it fails to appreciate is that § 7 must be given a broad reading, and the exemption a narrow construction, in light of the overall purpose of § 7 to provide a scrutiny needed in the public interest. As the FPC brief notes, (pp. 18–20), § 7's public convenience and necessity standard does not require a finding that proposed rates are just and reasonable as a precondition to certification.[55] However, the fact that § 7 does not give a complete "bond of protection" against initial rates in excess of a "just and reasonable" level, is no basis for stretching the exemption proviso to sweep aside the critical safeguards that are embodied in its certification process.[56]

---

**51.** *See id.* at 388, 389–91, 79 S.Ct. 1246. The Court found § 7's certification requirement in the front line of protection against excessive initial rates. The Commission's authority to institute hearings under § 5, 15 U.S.C. § 717d (1970), to review all rates and set the just and reasonable rate "to be thereafter observed" functions as a limited check on excessive initial rates which might survive testing in a § 7 proceeding. *See* 360 U.S. at 389–90, 79 S.Ct. 1246. Section 4 protects against unreasonable increases in rates (by empowering the Commission to suspend a proposed rate increase, for five months, and thereafter require a refund of amounts collected in excess of the just and reasonable rate) 15 U.S.C. 717c (1970), *see* 360 U.S. at 389, 79 S.Ct. 1246, but it provides no protection against excessive initial rates.

**52.** 360 U.S. at 389, 79 S.Ct. at 1255.

**53.** *Id.* at 391, 79 S.Ct. at 1255.

**54.** Brief for Respondent at 17, 21.

**55.** *See Atlantic Refining Co., supra* note 47, at 390–91, 79 S.Ct. 1246.

**56.** Although § 4(a) requires that "[a]ll rates and charges . . . received by any natural-gas company . . . shall be just and reasonable," neither the Commission nor the courts have required that initial rates meet that standard as a condition to certification under § 7. The Supreme Court explained that .

the delay inherent in determining just and reasonable rates made such a requirement inappropriate for regulation of initial rate under § 7. *See* United Gas Improvement Co. v. Callery Properties, Inc., 382 U.S. 223, 227–28, 86 S.Ct. 360, 15 L.Ed.2d 284 (1965). Nor have refunds been required where permanent certificate rates have been found to exceed the just and reasonable rate. Although this result deviates from the "logic" of the Act's "complete, permanent and effective bond of protection," it normally serves "to speed refunds to consumers and to assure producers of a firm price." FPC v. Sunray DX Oil Co., 391 U.S. 9, 36–37, 88 S.Ct. 1526, 1541 (1968).

The absence of complete symmetry in the interworking of §§ 4, 5, and 7 does not minimize the importance of the protection afforded by the certification requirements. Following CATCO, the FPC adopted a practice of certifying initial sales at the price approved in "contemporaneous certificates, no longer subject to judicial review or in any way 'suspect.'" United Gas Improvement Co., *supra,* 382 U.S. at 227, 86 S.Ct. at 363; *See* Public Service Comm'n v. FPC, *supra* note 47, 117 U.S.App.D.C. at 290–92, 329 F.2d at 245–47. This procedure provided considerable safeguards pending completion of area proceedings to establish just and reasonable rates. Consumer views as to the appropriate in-line rates could be aired in certification proceed-

## III. ORDER 491 AS A MEANS OF INDIRECT REGULATION

To avoid the charge that a § 7(c) exemption would ignore impact of the exempted sales on price levels and hence constitute impermissible deregulation,[57] the FPC relies on the provision in Order 491–B prohibiting pipelines from passing on to consumers purchased gas costs from contracts "improvidently consummated at a rate which was more than necessary to secure the gas for the interstate market."[58] The court is not clear what this FPC analysis portends, whether it is local color to induce an expansive reading of the § 7(c) exemption, or a larger contention of inherent authority in the absence of impact on the consumers, a claim, or rather a disclaimer, that any error was not "prejudicial." In any event, this broadside justification for the exemption program must fail, for the reasons stated recently by the Supreme Court in FPC v. Texaco.[59]

Texaco found that "the rates of all gas producers" must conform to the just and reasonable requirement of §§ 4 and 5. It disposed of the FPC's contention that its exemption of small producers from direct control was valid because it was part of an overall program that was tantamount to "indirect regulation" of such producers. The Court concluded that indirect regulation would be valid, "providing that it [the Commission] insures that the rates paid by pipelines, and ultimately borne by the consumer, are just and reasonable."[60] In the present case, the Commission made no attempt to evaluate the reasonableness of the projected rates which would be "paid by pipelines" to producers under the 180 day exemption. Even if the producers charged the interstate pipelines no more than they charged other bidders in the unregulated intrastate market, Texaco took occasion to "stress that in our view the prevailing price in the market place cannot be the final measure of 'just and reasonable' rates mandated by the Act."[61] And there is nothing in Order 491 which prohibits the interstate pipeline from offering more, to coax the producer to sell in the interstate market. Indeed, the Commission expressly assured producers that they could keep, without risk of refund, any price they could obtain from the beleaguered pipelines.

Throughout the years in controversies such as Phillips[62] and CATCO, the FPC has sought to justify inaction at the level of producer rates on the ground

ings and judicial review was available to set aside arbitrary in-line prices. In addition, consumers could seek refunds of amounts collected under temporary certificates in excess of the in-line rate. See note 42 supra.

The Commission's reliance on the distinction between the § 4 and § 7 standards overlooks the significant protections contained in each provision. The deviations from just and reasonable rates that are tolerated to accommodate the need for prompt certification determinations may not be acceptable when the Commission dispenses with certification of initial sales. See FPC v. Texaco, Inc., 417 U.S. 380, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974) (requiring that all producer rates be just and reasonable under a scheme of indirect regulation).

**57.** See Brief for Respondent at 27–28.

**58.** Order 491–B, supra note 1, at 14.

**59.** 417 U.S. 380, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974). Texaco involved Order 428 which granted a blanket certificate to all small producers exempting their existing and future sales from direct rate regulation. The Commission proposed to regulate small producer

sales indirectly by allowing large producers and pipelines to pass on only costs that were not "unreasonably high considering appropriate comparisons with highest contract prices for sales by large producers or the prevailing market price for intrastate sales in the same producing area." Order 428, 45 FPC 454, 457 (1971). The Court found that "the Commission is free to engage in indirect regulation of small producers by reviewing pipeline costs of purchased gas, providing that it insures that the rates paid by pipelines, and ultimately borne by the consumer, are just and reasonable." 417 U.S. at 401, 94 S.Ct. at 2328. But it concluded that Order 428 could not "stand in its present form" because of its failure to state clearly that producers would be allowed to receive and pipelines would be authorized to collect only just and reasonable gas rates. Id. at 395–97, 94 S.Ct. 2315.

**60.** Id. at 387, 401, 94 S.Ct. at 2328.

**61.** 417 U.S. at 397, 94 S.Ct. at 2326.

**62.** Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954).

that the pressures built up by producer rate increases could somehow be contained at the pipeline level by invoking a regulatory agency's authority to disallow "excessive" costs. And throughout the years, the Court has found this professed substitute inadequate. Both Order 491–B and the Commission's brief speak only of its statutory duty to protect consumers from exploitation by the natural gas companies.[63] The Commission's bypassing of its statutory duty as to producer rates, to insure that the rates paid to producers were just and reasonable, renders Order 491 vulnerable under *Texaco*.[64]

Turning our focus to the rates "ultimately borne by the consumer," we note that Order 491 does "not expressly mention the just-and-reasonable standard."[65] Order 491–A merely stated that the "rate at which these emergency volumes are committed to interstate pipelines will be examined in our pipeline regulatory review under §§ 4 and 5 of the Act, in the same manner as purchases are reviewed under prior emergency procedures."[66] Order 491–B added that pipelines will be permitted to pass on purchased gas costs *"only* when such rates can be shown to have been required by the public interest."[67] The FPC amplified its intention by noting that costs from purchases "improvidently consummated at a rate which was more than necessary to secure the gas for the inter-

state market" could not be fully recouped from consumers.[68] The Commission's brief seeks to add a gloss that "any unreasonably high prices" or any costs that "appear to have been unreasonably incurred" may not be passed on to consumers.[69]

■ As in *Texaco,* the FPC's order does not set forth its standard of indirect regulation with "requisite clarity" to provide assurance that the rates "ultimately borne by the consumer are just and reasonable."[70] The entire point of Order 491 is to free "pipelines facing emergencies" from price constraints to "enable them to secure substantial gas supplies which might otherwise be lost to the intrastate market or interstate pipelines not facing an emergency."[71] The tenor of the order suggests that the public interest will be served by matching or outbidding intrastate customers (from whom the producers may obtain unreasonably high rates, so far as Federal law is concerned), and that such necessary expenditures for scarce gas supplies may be recouped from consumers. We believe that *Texaco* precludes the FPC from using a scheme as open-ended as this one as equivalent to a meaningful technique of indirect regulation.[72]

■ A related shortcoming is the Commission's failure to provide pipelines with standards to guide them in latitude contemplated in contracting for emer-

---

**63.** *See* Order 491–B, *supra* note 1, at 13–14, Brief for Respondent at 25.

**64.** The Commission attempts to distinguish *Texaco* as involving a permanent exemption of all small producer rates from direct regulation. We do not find this factual difference determinative. First, the comparatively small quantities of gas involved do not excuse deviation from the just and reasonable standard for not even "a little unlawfulness is permitted." 417 U.S. at 399, 94 S.Ct. 2315. Second, *Texaco* makes no exception to the just and reasonable requirement for initial sales even though such new small producer sales were included within the scope of Order 428. The Court's failure expressly to address the question to initial sales leaves open the possibility that they could be tested against comparable "in-line" rates rather than the just and reasonable rate. *But see* note 56 *supra.* In either case, the

Commission failed to insure proper producer rates through its scheme of indirect regulation.

**65.** 417 U.S. at 396, 401, 94 S.Ct. 2315.

**66.** 50 FPC at 852.

**67.** Order 491–B, *supra* note 1, at 13 (emphasis into original).

**68.** *See id.* at 14.

**69.** Brief for Respondent at 13, 26.

**70.** *See* 417 U.S. at 397, 401, 94 S.Ct. 2315.

**71.** *See* Order 491–B, *supra* note 1, at 7.

**72.** A further problem is presented by the possibility that 491 sales will escape indirect regulation as a result of purchased gas adjustment clauses in existing pipeline rate tariffs. Under those clauses pipelines may be able to pass on their increased gas expenses from Order 491 purchases without filing a rate increase under

gency purchases. Under Order 491, if pipelines pay too much for gas supplies, they may incur expenses that are nonrefundable."[73] In *Texaco* the Court was concerned with the squeeze on the pipelines which stemmed from making payments that would be both disallowed and nonrefundable, and made it clear that any such program would require "guidance" for those that might be affected.[74] The warning in Order 491 against "improvident" contracts does not provide adequate guidance to protect the pipelines. The Commission attempts to avoid this problem by stating that the procedures are "purely optional" and that the order does not "coerce a pipeline into making such purchases." But a commission seeking to defend an exemption order cannot in this way ignore its responsibility to give guidance to pipelines that accept the Commission's open-door invitation to obtain needed supplies through Order 491 purchases.[75]

## IV. THE REFUND ISSUE

Our prior decision to stay Order 491–B pending appeal rested on a concern that refunds might not be available as a means of remedying any resulting injury. In applying to the Supreme Court to vacate the stay, the Solicitor General represented that should the order be set aside on review the Commission "would have full authority to require refunds of any [excessive] rates collected by a natural gas company."[76] The Supreme Court granted the application on December 20, 1973, and purchases under the order

were allowed to proceed pending review in this court.

■ Petitioners now urge us to order refunds in addition to setting aside Order 491. But not every decision invalidating an agency order is given full retroactive effect.[77] We express no opinion on the refund issue, beyond saying that, in our view, it involves complex and difficult questions which must be presented to and addressed by the Commission in the first instance. In matters of prospective and retroactive effect, there are large questions of equity and public interest—both for agencies[78] and for courts.[79] While full refund under an invalid order is a sound basic rule, it may be offset, at least in part, by the lack of a mechanism to restore the full status quo ante, the fact that consumers may have had the benefit of some increase in supply that would not have been forthcoming under § 7 procedures, albeit purchased at an excessive price, and the fact that some portion of the increased prices paid may be discerned as consistent with just and reasonable producer rates.

■ The FPC will have to consider the effect of its representation to the Supreme Court and its prior assurance to producers that no refunds would be required under the order.[80] Whether and how to exercise an authority to order refunds requires the development of factual matters not presently in the record as well as a broad and penetrating analysis of "the factors pro and con a refund, and its amount or extent, in arriving at an equitable conclusion."[81]

§ 4. *See* Order 452, 47 FPC 1049 (1972). The Commission has failed to explain how it can protect consumers against rate increases in the absence of an amendment to the purchased gas clause regulation, 18 C.F.R. § 154.-38(d)(4) (1974), or a § 4 filing. *See* Brief for Petitioner at 26.

73. *See* Order 491–B, *supra* note 1, at 14.

74. *See* 417 U.S. at 393, 94 S.Ct. 2315.

75. *See* Brief for Respondent at 27; Brief for Pipeline Intervenors at 15–16.

76. *See* Application to Vacate Stay entered by the United States Court of Appeals for the District of Columbia Circuit, Dec. 1973, at

9–10 n. 7 (relying on United Gas Improvement Co. v. Callery Properties, Inc., 382 U.S. 223, 229, 86 S.Ct. 360, 15 L.Ed.2d 284 (1965)).

77. Zuber v. Allen, 396 U.S. 168, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969); Blair v. Freeman, 125 U.S.App.D.C. 207, 370 F.2d 229 (1966).

78. *See* Niagara Mohawk Power Corp. v. FPC, 126 U.S.App.D.C. 376, 379 F.2d 153 (1967).

79. *See* cases cited note 77 *supra*.

80. *Cf.* FPC v. Sunray DX Oil Co., 391 U.S. 9, 46, 88 S.Ct. 1526, 20 L.Ed.2d 388 (1968).

81. *See* Public Service Comm'n v. FPC, 117 U.S.App.D.C. 287, 295, 329 F.2d 242, 250, cert.

## V. CONCLUSION

 As a reviewing court, we must grant the Commission broad latitude in devising methods of regulation "in this time of acute energy shortage." [82] But, although we are receptive to "novel" approaches, we cannot neglect our duty to "assure fidelity to the functions assigned to the regulatory agencies by Congress." [83] Our examination of Order 491 convinces us that the Commission has exceeded its authority under the Act. In essence, it has attempted to remedy the shortfall of supply in the interstate market by authorizing a supplemental injection of large quantities of gas through sales freed from the constraints of meaningful regulation. We reject the FPC's claim that § 7(c) supports this substantial, partial deregulation, and find that the Commission has neglected its rate control responsibilities under the Act. Congress has yet to embrace proposals for deregulation of new gas supplies.[84] Until it acts to alter the present "system of regulation by an agency subject to court review, the courts may not abandon their responsibility by acquiescing in a charade or a rubber stamping of nonregulation in agency trappings." [85]

Accordingly, the orders under review are set aside.[86]

So ordered.

---

denied, 377 U.S. 963, 84 S.Ct. 1644, 12 L.Ed.2d 735 (1964).

**82.** *See, e. g.,* Mobile Oil Corp. v. FPC, 417 U.S. 283, 331, 94 S.Ct. 2328, 2356, 41 L.Ed.2d 72 (1974); Public Service Comm'n v. FPC, 167 U.S.App.D.C. 100, 511 F.2d 338, at 354 (1975).

**83.** *See* Texas Gulf Coast Area Rate Cases, 159 U.S.App.D.C. 172, 208, 487 F.2d 1043, 1079 (1973), vacated and remanded sub nom., Shell Oil Co. v. Public Service Comm'n, 417 U.S. 964, 94 S.Ct. 3166, 41 L.Ed.2d 1136 (1974).

**84.** *See* FPC v. Texaco, Inc., 417 U.S. 380, 400–01, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974). The natural gas deregulation bills introduced in the 93d Congress, S. 2048 and H.R. 7507, did not receive committee approval in either chamber despite President Ford's September 12, 1974, message to Congress placing priority on natural gas deregulation.

**85.** Public Service Comm'n v. FPC, 167 U.S.App.D.C. 100, at 116, 511 F.2d 338, at 354 (1975).

**86.** Intervenor Associated Gas Distributors claims that we need not set aside the entire order if we find that the FPC has exceeded its authority in granting a 180 day exemption for sales by gas producers. While we recognize that sales and exchanges of gas by intrastate distribution companies may be distinguishable from the producer sales at the core of this dispute, the matter has not been subject to scrutiny by the Commission and the other parties or addressed at argument. In this posture, we cannot say that this minor strand of Order 491 should be severed and preserved. This question may properly be addressed by the courts if it is first presented to the FPC for focused consideration in light of this opinion.