**PUBLIC SERVICE COMMISSION OF WEST VIRGINIA, Petitioner,**

v.

**ECONOMIC REGULATORY ADMINISTRATION, UNITED STATES DEPARTMENT OF ENERGY, Respondent,**

Southern Natural Gas Company, et al., Consolidated System LNG Company, Columbia LNG Corporation, Columbia Gas Transmission Corporation, Intervenors.

**CONSUMER FEDERATION OF AMERICA and Consumer Energy Council of America, Petitioners,**

v.

**ECONOMIC REGULATORY ADMINISTRATION, UNITED STATES DEPARTMENT OF ENERGY, Respondent,**

Southern Natural Gas Company, et al., Consolidated System LNG Company, Columbia LNG Corporation, Columbia Gas Transmission Corporation, Intervenors.

Nos. 84–1372, 84–1373.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 1, 1985.

Decided Nov. 22, 1985.

Morton L. Simons, Washington, D.C., with whom Charles E. Hill, Washington, D.C., was on the brief for petitioners in No. 84–1373.

Richard E. Hitt was on the brief for petitioners in No. 84–1372.

Thomas H. Kemp, Atty., Dept. of Energy, Washington, D.C., with whom Arthur S. Weissbrodt, Atty., Dept. of Energy was on the brief for respondent in Nos. 84–1372 and 84–1373. Catherine C. Cook, Atty., Dept. of Energy, Washington, D.C., also entered an appearance for respondent in Nos. 84–1372 and 84–1373.

James J. Flood, Jr., Washington, D.C., with whom William A. Major, Jr. and Patrick B. Pope, Birmingham, Ala., were on the brief for intervenors, Southern Natural Gas Company, et al. in Nos. 84–1372 and 84–1373.

Charles R. Brown, Mark G. Magnuson, James L. Blasiak, and John E. Holtzinger, Jr., Washington, D.C., were on the brief for intervenor, Consolidated System LNG Company in Nos. 84–1372 and 84–1373.

Hart T. Mankin, L. Michael Bridges, and Earl L. Fisher, Jr., Wilmington, Del., were on the brief for intervenor, Columbia LNG Corporation, in Nos. 84–1372 and 84–1373.

Glen L. Kettering, Charleston, W.V., entered an appearance for intervenor, Columbia Gas Transmission Corporation in Nos. 84–1372 and 84–1373.

Before ROBINSON, Chief Judge, MIKVA and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

This case concerning Algerian liquified natural gas (LNG) and the refund discretion of the Economic Regulatory Administration (ERA) has returned to us after a remand; we now write a closing chapter. In *West Virginia Public Services Commission v. United States Department of Energy*, 681 F.2d 847 (D.C.Cir.1982) (*West Virginia PSC*), we vacated an ERA order approving a price escalation for LNG imported from Algeria for delivery in the United States to Columbia LNG Corp. (Columbia), Consolidated System LNG Co. (Consolidated), and Southern Energy Co. (Southern). We explained in *West Virginia PSC* that the Algerians had refused to continue supplying the LNG even at the increased prices; therefore the case remained live only as to the few months of deliveries made in the early part of 1980. 681 F.2d at 866. We remanded for resolution of a sole question: "whether or not the affected consumers are entitled to a refund of 'excessive charges' paid for gas delivered between January and April 1980." *Id.* at 867.

On remand, the ERA determined, after balancing the equities, that "it is not in the public interest to award refunds." *Columbia LNG Corp., et al.*, Opinion No. 11–A, 1 E.R.A. ¶ 70,120 (1984). Petitioners Public Services Commission of West Virginia (PSC), Consumer Federation of America (CFA), and Consumer Energy Council (CEC) invite our review of the ERA's decision denying refunds.[1]

We find the ERA's disposition "equitable in the circumstances of this litigation," *Las Cruces TV Cable v. FCC*, 645 F.2d 1041, 1047 (D.C.Cir.1981) (quoting *Wisconsin Electric Power Co. v. FERC*, 602 F.2d 452, 457 (D.C.Cir.1979)), and supported by substantial evidence. The ERA fairly determined from adequate evidence on the record that the price charged under the order we vacated was reasonable in relation to the prices of alternative supplies, and that the LNG importers were not unjustly enriched by the payments they received. We therefore affirm the ERA's decision.

## I. BACKGROUND

The history of this litigation[2] traces back to 1969, when Algeria's state-owned oil and gas company, Société Nationale pour la Recherche, la Production, le Transport, la Transformation et la Commercialisation des Hydrocabures (Sonatrach), agreed to supply LNG to the United States enterprise El Paso Algeria Corporation (El Paso) at the rate of 1 billion cubic feet a day for 25 years. El Paso assumed responsibility for transporting the LNG from Algeria to Georgia for resale to Southern, and to Maryland for resale to Columbia and Consolidated. The LNG was to be revaporized in Georgia and Maryland and then distributed to customers in the areas served by these companies.

The contract with Sonatrach established a base price for the LNG of $.305/MMBtu (million British thermal units), with provision for periodic automatic adjustment of a portion of this base. Delivery of the gas was delayed until March 1978, by which time the contract price was $.37/MMBtu. The market price of LNG had risen steeply above this figure, however; by early 1979, El Paso was paying Sonatrach only one-fifth as much as other United States concerns were paying for natural gas from every other import project. Sonatrach insisted upon and obtained an amendment increasing the contract price. The amendment established a base price of $1.15/MMBtu for the period July 1 to December 31, 1979. Beginning January 1, 1980, the price was to be adjusted each January and July according to a specified

---

1. PSC challenges the decision as it relates to Columbia and Consolidated; CFA and CEC petition for review as to all three LNG importers.

2. We summarize here the background set out in detail in *West Virginia PSC,* 681 F.2d at 849–52.

formula. The agreement provided that either party could cancel if the ERA failed to approve the interim price by August 31, 1979, or the entire agreement by December 31, 1979. The ERA's authority to approve the price increase rested upon section 3 of the Natural Gas Act (NGA), 15 U.S.C. § 717b (1982).[3]

On August 22, 1979, the ERA approved the interim price arrangement without a hearing. On December 29, 1979, the agency issued an opinion in *Columbia LNG Corp., et al.,* Opinion No. 11, 1 E.R.A. ¶ 70,110 (1979), which approved the entire contract amendment so that the base price of the Algerian LNG beginning January 1, 1980, became $1.94/MMBtu. Customers paid that price until the Algerian government unilaterally suspended deliveries in April 1980.

In mid-April 1980, PSC, CFA, CEC, Georgia Industrial Group, and General Motors Corp. petitioned for this court's review of Opinion No. 11. We vacated the ERA's order and remanded. We found that, in the rush to ward off Algeria's cancellation of the agreement, the ERA had "moved too quickly on the issue of need [for the LNG] —evidencing more an attitude of desperation than the careful examination and judgment which this key issue required." *West Virginia PSC,* 681 F.2d at 865. The agency had cited a national need for the gas, despite its own precedent identifying a demonstration of regional need as the crit-

ical showing. *Id.* at 860–62. We observed, moreover, that even the finding of national need was unsupported by record evidence. *Id.* at 862. In remanding for consideration of refunds, however, we "expressly offer[ed] no opinion as to the ultimate rights of the consumers who ha[d] challenged the agency's action." *Id.* at 866.

On remand, all parties agreed that the existing record, supplemented by written comments, afforded an adequate basis for the ERA's consideration and disposition of the refund issue. The ERA observed, in introducing its decision, that the case was one "of first impression." Opinion No. 11-A, at 4. No prior decision had dealt with refunds in the context of an international gas transaction authorized under NGA section 3. The agency therefore looked to "analogous cases involving domestic gas supplies," and to "decisions regarding refunds by other administrative agencies." *Id.* As earlier recounted, the ERA determined that refunds were not in the public interest because the consumers had paid a reasonable price for the gas in question and the LNG importers had not gained an unfair benefit.

## II. DISCUSSION

### A.

■ We address first the question whether the ERA operated under a correct understanding of its charge when it assert-

---

**3.** That section provides:

> After six months from June 21, 1938 no person shall export any natural gas from the United States to a foreign country or import any natural gas from a foreign country without first having secured an order of the Commission authorizing it to do so. The Commission shall issue such order upon application, unless, after opportunity for hearing, it finds that the proposed exportation or importation will not be consistent with the public interest. The Commission may by its order grant such application, in whole or in part, with such modification and upon such terms and conditions as the Commission may find necessary or appropriate, and may from time to time, after opportunity for hearing, and for good cause shown, make such supplemental order in the premises as it may find necessary or appropriate.

The Federal Power Commission (FPC), which originally had regulatory authority over gas imports and exports, was the agency that approved the 1969 Algerian LNG import contract. Columbia LNG Corp., Op. No. 622, 47 F.P.C. 1624 (1972), *as modified by* Op. No. 622-A, 48 F.P.C. 723 (1972), *remanded in part in Columbia LNG Corp. v. FPC,* 491 F.2d 651 (5th Cir.1974), and *reissued in* Columbia LNG Corp., Op. No. 786, 57 F.P.C. 354 (1977).

In 1977, regulatory authority under section 3 was transferred to the Department of Energy, DOE Act §§ 401, 402(f), 42 U.S.C. §§ 7171, 7172 (1982); the Department, in turn, delegated export-import approval authority to the ERA. 42 Fed.Reg. 60,726 (Appendix) (Nov. 29, 1977). Despite earlier approval of the contract by the FPC, the ERA was bound to consider whether importation of gas at the proposed higher price was in the public interest. *See West Virginia PSC,* 681 F.2d at 863–64.

ed that it had "broad discretion to determine whether refunds are in the public interest" and that its task was to "balance the equities" evenhandedly. Opinion No. 11–A, at 4. Petitioners, by contrast, urge that, once a price increase for imported gas is vacated on judicial review, refunds must be directed unless exceptional equities indicate otherwise. Petitioners, in other words, would have us declare a strong, albeit rebuttable, presumption in favor of refunds. We hold that the ERA's perspective on refunds was correct for this case.

Our decision in *West Virginia PSC* instructed no refund presumption; we then "expressly offer[ed] no opinion" on the point. 681 F.2d at 866. Nor, as the ERA observed, does NGA section 3 offer any explicit guide. *See supra* note 3. Analogously applicable case law familiarly enjoins the agency to state and consider the relevant factors and to reach an equitable decision backed by substantial evidence. *See Las Cruces TV Cable*, 645 F.2d at 1047. Commenting on the agency's function and ours in adjudicating refund issues of the order presented here, Judge McGowan said:

> Th[e] stress on "equitable considerations," indicates that, while the agency has a duty to consider the relevant factors in making a refund decision and enjoys a broad discretion in weighing those factors, the precise manner in which these general principles should be applied by a reviewing court depends upon, as is traditional in cases sounding in equity, the facts of the particular case.

*Id.* at 1047–48. We adhere to that sage statement.

In the absence of precedent on refunds in the context of an international gas transaction authorized under section 3 of the NGA, precedent under section 7 of the Act, 15 U.S.C. § 717f (1982), all parties agreed, provides an appropriate first reference. Section 7 concerns certification for interstate transmission of natural gas; to operate in the interstate arena, a company must obtain Federal Energy Regulatory Commission (FERC) certification that the "public convenience and necessity" would be served thereby. FERC may allow operations to start under an interim rate subject to a later determination of rate reasonableness. If the "just and reasonable" rate ultimately established is lower than the rate initially set, the agency has authority to require a refund.

In *West Virginia PSC*, we recognized that the two provisions, section 3 concerning international transactions, and section 7 on interstate activity, have a similar office. 681 F.2d at 855–59; *see id.* at 856 n. 38 (when FPC administered both sections, *see supra* note 3, occasion to address section 3 separately and distinctly was uncommon). Accordingly, the administrative agency "has long regarded Section 3's 'public interest' standard and Section 7's 'public convenience and necessity' standard as substantially equivalent." *Distrigas Corp. v. FPC*, 495 F.2d 1057, 1065 (D.C.Cir.), *cert. denied*, 419 U.S. 834, 95 S.Ct. 59, 42 L.Ed.2d 60 (1974).

The section 3 and section 7 prescriptions are not identical, however. The former section may tilt slightly in favor of the permit applicant. Under section 3, agency authorization is to be furnished *unless* there is an express finding by the agency that the "proposed exportation or importation will not be consistent with the public interest." *See supra* note 3. Under section 7, the agency must make a *positive* finding of consistency with the public interest. *See Cia Mexicana de Gas v. FPC*, 167 F.2d 804, 806 (5th Cir.1948); *West Virginia PSC*, 681 F.2d at 856. We have described the discretion to grant permits entrusted to the administrative agency under section 3 as "elastic"—even more flexible than the discretion afforded to the administrative authority under section 7. *See Distrigas Corp.*, 495 F.2d at 1064. Discretion to deny refunds, case law thus suggests, is certainly no less broad under section 3 than it is under section 7, and may well be greater under the former section.

Quoting snippets from decisions addressing refund authority under section 7, petitioners urge that court and agency expressions on the subject add up to a powerful presumption favoring refunds when a rate initially allowed by the administrative agency is later found impermissible. For exam-

ple, petitioners emphasize a statement by Judge Leventhal that "full refund under an invalid order is a sound basic rule." *Consumer Federation of America v. FPC*, 515 F.2d 347, 359 (D.C.Cir.1975). Upon reading the entire statement, however, it becomes plain that Judge Leventhal declined to instruct the agency to order refunds and expressed no firm opinion on the issue. Instead, he referred the matter to the agency for initial consideration, listing among relevant factors two that figure in the instant case: "the lack of a mechanism to restore the full status quo ante,"[4] and "the fact that [at least] some portion of the increased prices paid may be discerned as consistent with just and reasonable ... rates." *Id.; see infra* pp. 37–38. Ultimately, Judge Leventhal instructed the agency to find and analyze "the factors pro and con a refund ... in arriving at an equitable conclusion." 515 F.2d at 359 (quoting *Public Service Commission v. FPC*, 329 F.2d 242, 250 (D.C.Cir.), *cert. denied*, 377 U.S. 963, 84 S.Ct. 1644, 12 L.Ed.2d 735 (1964)).[5]

That is essentially what the agency did in the matter at hand. No precedent we have come upon,[6] reasonably read, suggests that the ERA was wrong in stating that its mission was to "analy[ze] ... the facts on both sides of the issue," and then "balance the equities" in order "to determine whether refunds are in the public interest." Opinion No. 11–A, at 4.

## B.

The ERA's decision to deny refunds turned, primarily, on the agency's price comparisons. The agency looked to the cost to pipelines of new incremental supplies alternative to the imported LNG, available for a period comparable to the long term of the contract with Sonatrach. We find entirely rational the ERA's judgment to focus, not on short-term interruptible supplies, but on "like kind" comparisons: the LNG price measured against the price of other available firm gas supplies— arrangements geared to meeting on a dependable basis constant residential and commercial consumer requirements.

The ERA had projected a total price of $3.43 per MMBtu for the revaporized LNG. Opinion No. 11–A, at 5. The record showed that this price was less than the price of concurrent imports of natural gas; border prices in early 1980 for Mexican and Canadian natural gas, the ERA pointed out, ranged from $3.625 to $4.47 per MMBtu. *Id.* at 5 n. 12. The record further showed that the imported LNG price compared favorably with the prices of No. 2 distillate fuel oil and No. 6 residual fuel oil.

**4.** The ERA pointed out that "the order of refunds could not restore the parties to the ... position [they would have occupied] had [Opinion No.] 11 not been issued." Opinion No. 11–A, at 8. The ERA could not regulate Sonatrach, and recovery over against that state-owned entity in Algeria was at least questionable, particularly in view of the apparent reasonableness of the price paid to Sonatrach. *See infra* p. 37.

**5.** Petitioners also cite as supporting a "duty," rather than a "prerogative," to order refunds a footnote statement we made in *Public Service Commission v. FPC*, 543 F.2d 757, 834 n. 46 (D.C.Cir.1974), *cert. denied*, 424 U.S. 910, 96 S.Ct. 1106, 47 L.Ed.2d 314 (1976). In that case, however, the issue was *not whether, but when* refunds were due. *See* 543 F.2d at 834–35. Nor does Skelly Oil Co., 35 F.P.C. 849 (1966), reliably aid petitioners' argument. The Commission there referred to "the power and the duty" to order refunds when initial prices exceed those ultimately established, *id.* at 852, but it also said: " 'Whether refunds should be ordered is to turn on equitable considerations.' " *Id.* (quoting Ameranda Petroleum Corp., 31 F.P.C. 623, 639 (1964)).

**6.** We have considered as well refund precedent under section 4 of the NGA, 15 U.S.C. § 717c (1982), the section mandating that all rates "shall be just and reasonable." *Id.* § 717c(a). Section 4 explicitly refers to the agency's authority to require refund of the portion of a rate increase found not justified. *Id.* § 717c(e). While a refund remedy has been announced by the agency as the norm in this setting, *see* Opinion No. 595, 45 F.P.C. 674 (1971), *aff'd sub nom. Public Service Commission v. FPC*, 516 F.2d 746 (D.C.Cir.1975), reviewing courts have recognized the discretionary nature of the administrator's section 4 refund power, *see, e.g., Belco Petroleum Corp. v. FERC*, 589 F.2d 680, 686 (D.C.Cir.1978), and the deference due the agency's equitable accommodation of the competing interests. *See, e.g., Cities Serv. Gas Co. v. FERC*, 535 F.2d 1278, 1290 (D.C.Cir.1976).

Representative East Coast September/October 1979 prices noted by the agency for No. 6 fuel oil, for example, ranged from $3.46 to $4.12 per MMBtu. Opinion No. 11–A, at 6 n. 14.

The ERA next considered new domestic natural gas supplies. The price of new gas regulated under sections 102 and 103 of the Natural Gas Policy Act of 1978 (NGPA), 15 U.S.C. §§ 3312, 3313 (1982), was lower than the regasified price of the imported LNG, but the difference was not dramatic— NGPA ceiling prices plus transportation costs, the record indicated, yielded a total price in the neighborhood of $3.00 per MMBtu. Moreover, the ERA observed, "gas supplies from these [cheapest] categories were not available in comparable quantities nor for a term as long as that of the LNG project." Opinion No. 11–A, at 7.

■ In sum, the agency demonstrated that the imported LNG, although priced 14% higher than the cheapest categories of domestic gas, was priced lower than all other fairly comparable domestic supplies and all substitutable imported natural gas. The petitioners initially disdained the ERA's invitation to respond in kind; before the agency, they failed to show that they could have obtained alternative fuel supplies during the period in question at significantly lower prices, but on otherwise comparable terms. Instead, petitioners maintained that the ERA's failure to demonstrate a need for the imported gas made the reasonableness of the LNG price irrelevant.[7] It might be urged more plausibly, however, that if price is reasonable, need is irrelevant. Harm to or exploitation of consumers is not evident if the product for which they paid was priced comparably to the equivalent product they might have received instead.

■ Mindful of the objective of the NGA to "protect consumers against exploitation at the hands of natural gas companies," *West Virginia PSC*, 681 F.2d at 855 (quoting *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 610, 64 S.Ct. 281, 291, 88 L.Ed. 333 (1944)), we are satisfied that the ERA responsibly took into account the range of fuels that might have been supplied had the LNG not been imported, and fairly determined that no unreasonable charge had been exacted for the LNG.

■ Following its finding that the LNG price was reasonable, the ERA considered whether the LNG companies had unjustly gained any benefit. The order we vacated in *West Virginia PSC* had authorized no increase in the importers' shipping or revaporization and terminal costs, and the importers had paid the increased f.o.b. price directly to Sonatrach. "[T]he importers did benefit," the ERA recognized, "by receiving a return of and on equity between January and April 1980." Opinion No. 11–A, at 8. That enrichment, however, was not unjust, the agency reckoned; rather, the LNG companies gained only "reasonable returns from a commercial investment which provided a product at a reasonable price." *Id.* The ERA further observed that, in the particular circumstances presented—most notably, the concern to preserve the trading relationship with an enterprise operated by the Algerian government—the importers did not act inappropriately in paying over to Sonatrach the higher price that the ERA had approved, despite the prospect that the agency's order might be upset on judicial review (as it in fact was in *West Virginia PSC*). *Id.* Here too, we find the ERA's analysis fully rational and supported by the record. *See* 15 U.S.C. § 717r(b) (1982).

CONCLUSION

■ Consumer refunds afford a remedy by way of restitution. *United States v.*

---

**7.** In contrast to their general assertions during proceedings before the ERA, petitioners do present specific price comparisons in their briefs to this court. However, they offer no adequate justification for making such a presentation, for the first time, on judicial review rather than before the agency. *See* 15 U.S.C. § 717r(b) (1982) (court should consider objection not voiced before agency only if there is reasonable ground for the failure to raise the matter earlier); *Rhode Island Consumer Council v. FPC*, 504 F.2d 203, 212 (D.C.Cir.1974) (section 717r(b) intended to ensure that Commission has opportunity to deal with issues before reviewing court intervenes).

*Associated Transport, Inc.,* 505 F.2d 366, 369 (D.C.Cir.1974). Restitution is in order when "money was obtained in such circumstances that the possessor will give offense to equity and good conscience if permitted to retain it...." *Williams v. Metropolitan Washington Area Transit Commission,* 415 F.2d 922, 944 (D.C.Cir.1968) (en banc), *cert. denied,* 393 U.S. 1081, 89 S.Ct. 860, 21 L.Ed.2d 793 (1969) (quoting *Atlantic Coast Line R.R. v. Florida,* 295 U.S. 301, 309, 55 S.Ct. 713, 716, 79 L.Ed. 1451 (1935)). Judged by that standard, restitution is not mandated here. The ERA considered and equitably balanced the relevant factors. The agency's findings that the LNG price was reasonable and that the LNG importers gained no unjust enrichment are supported by substantial evidence. On this record, a reviewing court has no warrant to disturb the agency's exercise of discretion. Accordingly, we uphold the decision of the ERA that, in the circumstances of this case, refunds would not be in the public interest; we affirm the challenged orders; and we deny the petitions for review.

*It is so ordered.*