WEST VIRGINIA PUBLIC SERVICES COMMISSION, Petitioner,

v.

UNITED STATES DEPARTMENT OF ENERGY, Economic Regulatory Administration, Respondent,

Southern Natural Gas Co., etc., Columbia LNG Corp., etc., UGI Corporation, Pennsylvania Gas and Water Co., El Paso Algeria Co., Consolidated System LNG Company, Dayton Power and Light Company, Columbia Gas Distribution Companies, etc., et al., Georgia Industrial Gas Group and General Motors Corporation, Public Service Commission of the State of New York, Atlanta Gas Light Company, Intervenors.

GEORGIA INDUSTRIAL GROUP and General Motors Corporation, Petitioners,

v.

DEPARTMENT OF ENERGY, Charles Duncan, Secretary of Energy, and Economic Regulatory Administration, Hazel Rollins, Administrator, Respondents,

Southern Natural Gas Co., etc., UGI Corporation, etc., Columbia LNG Corporation, etc., Pennsylvania Gas and Water Co., El Paso Algeria Corporation, Washington Gas Light Co., People's Counsel of Maryland, Consolidated System LNG Co., Dayton Power and Light Co., Columbia Gas Distribution Companies, et al., Alabama Gas Corporation, Cincinnati Gas & Electric Co., et al., Intervenors.

CONSUMER FEDERATION OF AMERICA and Consumer Energy Council of America, Petitioners,

v.

ECONOMIC REGULATORY ADMINISTRATION and Department of Energy, Respondents,

Southern Natural Gas Co., etc., UGI Corporation, Columbia LNG Corporation, etc., Pennsylvania Gas and Water Company, Dayton Power and Light Co., El Paso Algeria Corporation, Consolidated System LNG Co., Washington Gas Light Co., People's Counsel of Maryland, Chattanooga Gas Company, Columbia Gas Distribution Companies, etc., et al., Alabama Gas Corporation, Cincinnati Gas & Electric Co., et al., Georgia Industrial Gas Group and General Motors Corporation, Public Service Commission of the State of New York, Atlanta Gas Light Company, Gas Light Company of Columbus, Intervenors.

Nos. 80–1402, 80–1410 and 80–1437.

United States Court of Appeals, District of Columbia Circuit.

Argued 22 Oct. 1981.

Decided 18 June 1982.

Richard E. Hitt, Jackson, Mich., with whom Robert R. Rodecker, Charleston, W. Va., was on the brief, for petitioner West Virginia Public Service Commission in No. 80–1402.

Morton L. Simons, with whom Charles E. Hill, Washington, D. C., was on the brief, for petitioners Consumer Federation of America, et al., in No. 80–1437.

Robert W. Clark, III, with whom Edward J. Grenier, Jr., Richard P. Noland, David A. Gross, Glen S. Howard, Robert P. Varian, Washington, D. C., and Julius Jay Hollis, Detroit, Mich., were on the brief, for Georgia Industrial Group and General Motors Corp., petitioners in No. 80–1410 and intervenors in Nos. 80–1402 and 80–1437.

Arthur S. Weissbradt, Atty., Dept. of Energy, for respondents.

James J. Flood, Jr., Washington, D. C., with whom William A. Major, Jr., Birmingham, Ala., was on the brief, for intervenors Southern Natural Gas Co. and Southern Energy Co.

John M. Hill, Giles D. H. Snyder, Stephen J. Small, Charleston, W. Va., and John F. Sisson, Wilmington, Del., were on the brief for intervenors Columbia LNG Corp. and Columbia Gas Transmission Corp.

Michael B. Sheppard, Lowell D. Turnbull and Carmen D. Legato, Washington, D. C., were on the brief for intervenor People's Counsel of Maryland.

Thomas E. Morgan, Wallace R. Barnes and Allan E. Roth, Columbus, Ohio, were on the brief for intervenors Columbia Gas Distribution Companies.

Peter H. Schiff, Albany, N. Y., Richard A. Solomon and Dennis Lane, Washington, D. C., entered appearances for intervenor Public Service Commission of the State of New York.

J. David Mann, Washington, D. C., entered an appearance for intervenor UGI Corp.

Arnold Fieldman, Washington, D. C., entered an appearance for intervenors Pennsylvania Gas and Water Co. and Chattanooga Gas Co.

Patrick Zailckas-Kremers, Houston, Tex., entered an appearance for intervenor El Paso Algeria Corp.

Lewis Carroll, Birmingham, Ala., Gordon M. Grant and Monte R. Edwards, Washington, D. C., entered appearances for intervenor Washington Gas Light Co.

George L. Weber, Washington, D. C., entered an appearance for intervenor Consolidated System LNG Co.

Richard M. Merriman and Robert S. Waters, Washington, D. C., entered appearances for intervenor Dayton Power and Light Co.

Harold L. Talisman, Washington, D. C., and A. S. Lacy, Birmingham, Ala., entered appearances for intervenor Alabama Gas Corp.

James J. Mayer, Cincinnati, Ohio, entered an appearance for intervenor Cincinnati Gas and Electric Co.

John E. Holtzinger, Jr., Washington, D. C., entered an appearance for intervenor Atlanta Gas Light Co.

Before MacKINNON, WILKEY and WALD, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILKEY.

WILKEY, Circuit Judge:

Petitioners in these consolidated cases challenge an order issued by the Economic Regulatory Administration (ERA) of the Department of Energy (DOE) amending a prior authorization to import liquified natural gas (LNG) from Algeria. In granting the authorization the ERA approved renegotiated price terms which amended an existing long-term supply contract by greatly increasing the base price for the LNG and by tying price escalation to the price of imported oil. Because we find that vital elements of the agency's decision are not supported by substantial evidence, we vacate the ERA's order and remand for further consideration.

## I. BACKGROUND

### A. The Initial Agreement

In 1969 Sonatrach,[1] the Algerian national oil and gas company, contracted to supply LNG over a twenty-five year period to El Paso Algeria Corporation (El Paso), an American enterprise, at a rate of 1,000,000 Mcf[2] per day, delivered at Arzew, Algeria. El Paso, in turn, would transport the LNG by cryogenic tanker to the east coast of the United States for resale at Elba Island, Georgia, to Southern Energy Company and at Cove Point, Maryland, to Columbia LNG Corporation and Consolidated LNG Corporation.[3] The LNG would be regasified at these points, ultimately finding its way to consumers throughout the regions serviced by these companies.

The 1969 import contract ("Initial Agreement"), as approved in 1972 by the Federal Power Commission (FPC),[4] called for an initial base price of $.0305/MMBTu,[5] f. o. b. Arzew. Twenty percent of this base price was subject to periodic escalation according to an inflation-based formula utilizing two Bureau of Labor Statistics indices.[6] The project required the applicants to construct terminal storage and vaporization facilities at Cove Point and Elba Island (at a combined cost of over $600 million) and the purchase by El Paso of LNG tankers and associated facilities (costing $1.6 billion).[7] For its part, the Algerian government was to construct a liquefaction plant and storage facilities at Arzew.

At the time the Initial Agreement was negotiated, the parties anticipated that the construction of Sonatrach's LNG facilities

---

1. "Sonatrach" is an imperfect acronym for "Société Nationale pour la Recherche, la Production, le Transport, la Transformation et la Commercialisation des Hydrocarbures."

2. 1,000,000 Mcf = 1 billion cubic feet.

3. These three companies, applicants before the ERA, contracted to pay a price comprised of Sonatrach's base price, El Paso's transportation costs and expenses, and a percentage profit to El Paso. By the applicants' contract with El Paso, the Sonatrach/El Paso contract could not be modified without the applicants' participation. Joint Appendix (J.A.) at 26–29, 30–32, 34–36.

4. Columbia LNG Corp., Op. No. 622, 47 F.P.C. 1624 (1972), as modified by Op. No. 622–A, 48 F.P.C. 723 (1972), remanded in part in Columbia LNG Corp. v. FPC, 491 F.2d 651 (5th Cir.

1974) and reissued in Op. No. 786, Columbia LNG Corp., 57 F.P.C. 354 (1977).

5. MMBtu = million British thermal units.

6. Four percent of the firm price was based on the price of steel mill products and sixteen percent was to be computed according to changes in the index of earnings of production workers in the petroleum and coal industries. The base line date for these two indices was to be 15 September 1971. The escalation provision was approved by the FPC as a manner of automatically raising the import ceiling price without requiring further agency review.

7. See Prepared Direct Testimony of George D. Carameros, Jr., at 9, J.A. at 749.

would cost about $540 million and that deliveries would begin in 1973 or 1974. As it turned out, the Arzew facilities cost over $2.2 billion and initial deliveries, which were still below the contracted volumes, were not made until March 1978.[8] This same time period witnessed dramatic changes in the entire character of world energy supply and demand, driving affected prices skyward at a rate all too familiar to American consumers. The price of LNG followed this spiral, and by early 1979 El Paso was paying Sonatrach only one-fifth as much as other U. S. concerns were paying for natural gas from every other import project.

## B. *The Amended Agreement*

In January 1979, ten months after deliveries had commenced under the Initial Agreement, Sonatrach made it clear to El Paso and the importing companies that Algeria would continue to provide LNG for the project only if the contract price were renegotiated to reflect the sudden and greatly increased prices of energy on the world market. Negotiations between Sonatrach and El Paso ensued, yielding an 11 May 1979 "Amendment Agreement" which provided for an interim increase in the LNG base price from 1 July to 31 December 1979 and established new pricing formulae and provisions to take effect on 1 January 1980. The "Interim Price" was set at $1.75/MMBtu, reduced by a "discount" of $0.60/MMBtu, to an f. o. b. price of $1.15. The base price was to be adjusted on 1 January 1980, and on each July and January thereafter, to reflect changes in the base price of "competing fuel oils." [9]

## C. *Proceedings before the ERA*

Joint application for agency approval of the amended contract was made by the three importing companies on 18 May 1979. Acting against rigid deadlines set by the Amendment Agreement,[10] the ERA issued, on 22 August 1979, an opinion and order [11]

---

**8.** The record suggests many reasons for the sharply escalated price and lengthy delays. Aside from the effects of worldwide inflation and the declining value of the dollar over this period of time, Sonatrach was forced to dismiss the contractor mid-project, due to failure of contracted performance, and to engage a second firm to complete the liquefaction facilities. J.A. at 1136.

**9.** The escalator clause of the Amended Agreement provided for price adjustment according to the following formula:

$$P = \text{U.S. } \$1.75 \left(0.50\frac{F}{F_o} + 0.50\frac{F'}{F_o'}\right) - Y$$

In this formula, the adjusted sales price per MMBtu (P) is calculated by multiplying the base sales price ($1.75) by an adjustment factor and subtracting any discount (Y). The adjustment factor (or escalator) is based upon equally weighted changes in the averages of the daily prices at New York for No. 2 heating oil

$$\left(\frac{F}{F_o}\right)$$

and No. 6 residual fuel oil

$$\left(\frac{F'}{F_o'}\right)$$

published in *Platt's OILGRAM*. Amendment Agreement No. 3, para. 1(2), J.A. at 1043.

The Amendment also provided that whenever either of the fuel oil indices used in the escalator formula ceased to accurately reflect changes in East Coast market prices for fuel oils of the same characteristics, the parties would meet to select new indices:

Such meeting shall be held upon reasonable notice given by one of the parties to the other, in writing, accompanied by data showing the necessity for such meeting.

The parties believe that the overall economic result of [the amendment] should produce, during the period July 1, 1979 through June 30, 1983, a cost after regasification no higher than the cost of imported competing fuels on the East Coast of the United States. If the parties agree, prior to the first four year review of the price . . . that this is not the case, for any reason, they will promptly meet to consider measures to be taken.

*Id.*, para. 1(3), J.A. at 1045.

**10.** The Agreement provided that it could be cancelled by either party if the Interim Price called for were not approved by the appropriate regulatory agencies by 31 August 1979 or if final non-appealable agency approval of all the pricing provisions had not been secured by 31 December 1979. *Id.*, para. 3–4, J.A. at 1048–49.

**11.** Opinion and Order Approving in Part an Application for Amendments to Import Authorization and for Interim Relief, and Granting Intervention, ERA Docket No. 79–14–LNG (18 May 1979) (designated as Opinion and Order

approving the interim price provisions of the renegotiated contract. At the same time, it announced that no decision concerning other aspects of the Amendment Agreement would be made without a further examination of the many issues involved.

A prehearing conference was held on 13 September 1979 "to explore and delineate procedures which may be appropriate to identify and resolve the range of issues . . . which the parties believe may be appropriate for hearing and decision." [12] The ERA concluded that procedural due process required an evidentiary hearing—which also had been demanded by the intervenors in the case—but at the same time made it clear that it would not permit such a hearing to interfere with meeting the 31 December deadline for decision. [13] The prehearing order established a schedule for the development and submission of testimony and exhibits and set forth four principal issues, as well as examples of encompassed subissues, as to which evidence could be submitted:

(1) the reasonableness of the price term contained in the Amendment Agreement:

(a) the availability of reasonably priced alternate supplies in sufficient quantity to replace the gas supply;

(b) the availability of such alternate supplies in the appropriate time period;

(c) the effects of disapproval of the contract amendment on the applicants, their supplier and customers, and the end-users of this gas supply.

(2) The reasonableness of the proposed escalator:

(a) the reasonableness of the *Platt's OIL-GRAM* price indices;

(b) the accuracy of the price of No. 2 and No. 6 low sulphur fuel oil in New York Harbor as a reflection of the cost of alternative energy sources in the areas served by the applicants.

(3) The reasonableness of the bases for amending the 1969 Initial Agreement including:

(a) the suppliers' increased costs;

(b) other factors which warrant an increased price; and

(c) the public benefits from approval of the Amendment Agreement.

(4) The impact on the U. S. balance of payments. [14]

The prehearing order placed upon the applicants the burden of demonstrating, upon these issues, that approval of the application would be consistent with the public interest. The order also permitted any party advocating incremental pricing of the LNG to submit evidence in support of that position, and placed upon them the burden of demonstrating that any such pricing was practicable and in the public interest, to include addressing at least two issues:

1. Whether this gas would clear the market if it were incrementally priced, and

2. The effect of incremental pricing on end-users. [15]

Evidentiary hearings commenced on 30 October 1979 and continued for nine days. Two additional weeks were permitted for party briefs, and opportunity for oral argument was denied.

On 29 December 1979 the agency issued DOE/ERA Opinion No. 11, [16] announcing the ERA's determination that, on balance, the price terms of the Amended Agreement were reasonable and that the LNG importation as revised was not inconsistent with

No. 7 by an Addendum dated 3 October 1979) (Op. No. 7).

**12.** *Id.* at 19.

**13.** *See* Pre-Hearing Order, ERA Docket No. 79–14–LNG (24 Sept. 1979), J.A. at 86.

**14.** *See id.* at 3–4, J.A. at 87–88.

**15.** *See id.* at 5, J.A. at 89.

**16.** Opinion and Order Approving the Joint Application of Columbia LNG Corp., *et al.*, for Amendments to Previous Orders Authorizing Importation of Liquified Natural Gas into the United States from Algeria, and for Amendments to Certain Related Contractual Provisions, ERA Docket No. 79–14–LNG (29 Dec. 1979) (Op. No. 11).

the public interest.[17] The agency thereby approved the amendment to the prior import authorization, conditioned only upon a requirement that the imported LNG would be subject to incremental pricing under rules issued by the Federal Energy Regulatory Commission pursuant to Title II of the Natural Gas Policy Act of 1978.[18] Imports beginning 1 January 1980 were base priced, per the contract, at $1.94/MMBtu.

As it turned out, the effects of the ERA's approval were short-lived. Deliveries under the contract were unilaterally suspended by the Algerian government around 1 April 1980, when El Paso refused to agree to yet further price increases demanded by Sonatrach. Government-level negotiations are currently underway.

## II. DISCUSSION

Although no single petitioner or intervenor disagrees with all aspects of the ERA's decision in Opinion No. 11, there are few (if any) elements of that decision which have escaped the collective challenge of the many parties before this court who oppose the Amendment Agreement. Rather than to discuss the many contentions separately—an approach which would lead to issues which need not be resolved at this time—we adopt a more structured approach of first defining the standards guiding our review and then scrutinizing the ERA's process and decision against those standards.

### A. The Standard of Judicial Review

■ We are faced here with an agency decision which is lodged firmly in that "hybrid" area of administrative action which is neither pure adjudication or fact-finding on the one hand, nor pure policy-making on the other. Our consideration of the matter therefore must be governed by two basic principles: The first is that we must recognize the broad policy-making role of the ERA and afford the agency "the same deference to its expertise that courts generally owe to the specialized boards and commissions created by the Congress to deal with complex and difficult problems in the field of economic regulation."[19] The second, a limiting gloss on the first, is provided by the relevant Natural Gas Act itself: "The finding of the Commission [read Administration] as to the facts, if supported by substantial evidence, shall be conclusive."[20] Thus, the deference owed to the ERA's fact-finding function is limited to those aspects of the decision which are supported by substantial evidence.

■ At their essence, these two rules are simply particularized applications of a third principle, founded in the fundamental requirements of the APA and applicable to our review of all agency activity, that an administrative finding, conclusion, or action must be held unlawful if it is, *inter alia*, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[21]

---

**17.** The agency offered the following conclusions leading to its ultimate decision:

(1) that "a renegotiated contract that better reflects costs incurred by Sonatrach is in the public interest," Op. No. 11 at 15;

(2) that, even though it exceeded the amount necessary to give Sonatrach full recovery of and a fair return on its costs, the renegotiated base price was reasonable, both in relationship to the original price, *id.* at 21–22, and the price of alternative fuels, *id.* at 28;

(3) that the escalator clause was reasonable, although based on import oil prices and therefore designed more to protect the commodity value of the LNG (Algeria's interest) than the value of the economic consideration under the contract, *id.* at 32;

(4) that, since Sonatrach would undoubtedly refuse further deliveries under the Initial

Amendment, "approval of the Amendment Agreement would result in very substantial balance of payments benefits to the U.S. compared to the only realistic alternative in the near future, which is to replace these volumes of LNG with imported petroleum," *id.* at 39; and

(5) that there was a need for these imported quantities of LNG, *id.* at 45–47.

**18.** 15 U.S.C. §§ 3341–3348 (Supp. IV 1980).

**19.** *California v. FPC*, 353 F.2d 16, 23 (9th Cir. 1965).

**20.** Natural Gas Act § 19(b), 15 U.S.C. § 717r(b) (1976).

**21.** 5 U.S.C. § 706(2)(A) (1976).

The net result is a "mixed" approach, calling on the one hand for scrutiny of the evidentiary support for the Administrator's findings of fact, but tempered on the other hand by a recognition that when Congress decided that regulation of the natural gas industry was necessary, it entrusted it "to the informed judgment of the [then Federal Power] Commission, and not to the preferences of reviewing courts." [22] The Supreme Court has offered the following summation of a court's responsibilities in reviewing agency action under the Natural Gas Act:

> First, it must determine whether the Commission's order, viewed in light of the relevant facts and of the Commission's broad regulatory duties, abused or exceeded its authority. Second, the court must examine the manner in which the Commission has employed the methods of regulation which it has itself selected, and must decide whether each of the order's essential elements is supported by substantial evidence. Third, the court must determine whether the order may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable.[23]

The third "element" of this process—a limited substantive review—is not to be mistaken for a responsibility to rebalance the competing interests at stake in a particular application proceeding. As Justice Harlan made clear in the next sentence, "The Court's responsibility is not to supplant the Commission's balance of these interests with one more nearly to its liking, but instead to assure itself that the Commission has given *reasoned consideration* to each of the pertinent factors." [24] This court itself has described this reasoned consideration as "the ultimate issue in judicial review of [agency] determination." [25]

■ In resolving this "ultimate issue" in this case, we recognize that the ERA's decision to permit the LNG imports in question was a product of a detailed and difficult analysis of both fact and policy. However, and notwithstanding the deference owed to the agency's consideration, we cannot allow the ERA's order to stand. Although we cannot say that the agency's action, taken in the abstract, necessarily exceeded its broad statutory authority, we do find that factual conclusions vital to the agency's detailed consideration are not supported by substantial record evidence, as they must be.

### B. The ERA's Authority under the Natural Gas Act

Before turning to a discussion of our concerns over the evidentiary basis for the ERA's decision to approve imports under the Amendment Agreement, it is helpful to examine the statutory basis for ERA activity.

The authority and relevant standards guiding the ERA's regulation of natural gas imports, originally the responsibility of the FPC,[26] are rooted in the plain language of

---

**22.** *Permian Basin Area Rate Cases*, 390 U.S. 747, 767, 88 S.Ct. 1344, 1360, 20 L.Ed.2d 312 (1968).

**23.** *Id.* at 791–92, 88 S.Ct. at 1372–73. *See also Mobil Oil Corp. v. FPC*, 417 U.S. 283, 94 S.Ct. 2328, 41 L.Ed.2d 72 (1974) (expressly endorsing these criteria).

**24.** 390 U.S. at 792, 88 S.Ct. at 1373 (emphasis added).

**25.** *Public Serv. Comm'n, State of New York v. FPC*, 511 F.2d 338, 345 (D.C.Cir.1975).

**26.** When Congress created the Department of Energy in 1977, it transferred to it most of the regulatory powers previously held by the FPC. DOE Act, §§ 401, 402(f), 42 U.S.C. §§ 7171, 7172 (Supp. IV 1980). These powers were in effect divided between the Secretary of Energy and the Federal Energy Regulatory Commission (FERC), a semi-independent body within DOE. The Secretary was in turn authorized to delegate any of his functions to an employee or official within the Department, DOE Act, § 642, 42 U.S.C. § 7252 (Supp. IV 1980). The ERA was created as a DOE subdivision available to receive any such delegation. DOE Act, § 206, 42 U.S.C. § 7136 (Supp. IV 1980).

The responsibility for import/export authorization under section 3 was one of few FPC responsibilities under the NGA not transferred

section 3 of the Natural Gas Act (NGA) of 1938. Section 3 provides,

> After six months from June 21, 1938 no person shall export any natural gas from the United States to a foreign country or import any natural gas from a foreign country without first having secured an order of the Commission authorizing it to do so. The Commission shall issue such order upon application, unless, after opportunity for hearing, it finds that the proposed exportation or importation will not be consistent with the public interest.

to FERC under the DOE Act. Sections 301(b) (42 U.S.C. § 7151(b)) and 402(f) (42 U.S.C. § 7172(f)) of the Act granted to the Secretary of Energy exclusive jurisdiction to resolve issues concerning import and export authorizations. By Delegation Order 0204–4, issued in November 1977 but effective retroactively to 1 October 1977, the Secretary delegated to the Administrator of the ERA

> the authority to adopt rules, issue orders, licenses and other allocations, collect fees and take such other action as may be necessary and appropriate to administer the following functions:
>
> . . . .
>
> 6. The exportation and importation of natural gas, pursuant to the provisions of Section 3 of the Natural Gas Act . . . and Executive Order 10485, except with respect to those pending cases assigned by rule to FERC.

42 Fed.Reg. 60,726 (Appendix) (29 Nov. 1977).

**27.** 15 U.S.C. § 717b (1976).

**28.** In fact, there were arguments in the Senate that section 3 could be deleted from the NGA entirely without impairing the overall regulatory scheme over natural gas. The following exchange occurred on the floor of the Senate during debates on H.R. 6586, 75th Cong., 1st Sess. (1937):

> MR. WHITE. Mr. President, I am in complete accord with the general purposes of the bill, and I approve the general regulatory powers that are granted by it. There is one section of the bill, however, which causes me some concern. Section 3 of the bill gives to the Commission the power to prohibit exports or to prohibit imports of natural gas. It seems to me that it is most extraordinary and unusual to confer upon any commission the power to ban the exports or imports of any commodity whatsoever. I am wondering just what peculiar or particular reasons there were for the insertion of this provision. I wonder if there is any justification for including in this regulatory bill such an extreme power as this. Of course, we have with respect to certain commodities granted to the President the power to prohibit their export.

The Commission may by its order grant such application, in whole or in part, with such modification and upon such terms and conditions as the Commission may find necessary or appropriate, and may from time to time, after opportunity for hearing, and for good cause shown, make such supplemental order in the premises as it may find necessary or appropriate.[27]

Although the history of the NGA does not fully reveal Congress' intent in enacting the particulars of section 3,[28] there is no

> I think we recognize the principle upon which that grant of power is based; but I cannot see why we should give to this Commission a power of that sweeping character.
>
> . . . .
>
> . . . The provision to which I refer reads that—
>
> No person shall export any natural gas from the United States to a foreign country or import any natural gas from a foreign country.
>
> Mr. WHEELER. That is for the purpose of conserving our natural gas in the event we wanted to conserve it. Suppose, for instance, that natural gas were being transported from this country into Canada when we had a shortage of natural gas, or suppose we were selling quantities of natural gas to foreign countries when we should not do it.
>
> Mr. WHITE. That is quite true, but the prohibition against imports of gas would not be in behalf of the conservation of our gas supply.
>
> Mr. WHEELER. On the other hand, it might be that some company wanted to import natural gas from Mexico, and the Commission might feel that it was not in the public interest that it should be imported into this country. So the bill simply gives the Commission power over interstate commerce either to prevent or to permit as the public interest may dictate.
>
> Mr. CONNALLY. Mr. President, does the Senator mean that this bill proposes to give unlimited power to determine the matter of policy as to whether we should import or export any gas? I thought it merely conferred the power to regulate the transportation, the rates, and things of that kind. I am not going to vote for the bill if it gives the Commission the power to decide whether we may export gas or may import it. That power belongs right here in this Congress.
>
> . . . .
>
> Mr. WHITE. . . . It seems to me that section 3 could be eliminated from the bill without impairing the efficacy of the proposed legislation.

reason to believe that the purposes behind the grant of broad regulatory authority over the importation and exportation of natural gas are in any way inconsistent with the general purposes of the NGA—to protect the consuming public from exploitative practices of the natural gas companies.[29]

Section 3 is for the most part unchanged from the earliest drafts of the Act,[30] and although Committee reports and congressional debates offer no explanation for even the few changes that were made, including modifications to the standard guiding Commission action under the section, the changes are not such that they resist the processes of common sense. For example, whereas under earlier drafts the agency's power extended only to exportation of natural gas (under "transportation to a foreign country"), the section as finally adopted included both exportation and importation. Thus, the standard under initial drafts that the Commission could deny an application only upon a finding that "the proposed transportation would impair the sufficiency of the supply of natural gas within the United States," [31] was changed to one obviously more consistent with the require-

ments of agency review of both export and import proposals: denial of an application must be based on a finding that "the proposed importation or exportation *will not be consistent with the public interest.*"

The Supreme Court has stated that "public interest" is properly framed by the purposes of the pertinent regulatory statute: "Thus, in order to give content and meaning to the words 'public interest' as used in the Power and [Natural] Gas Acts, it is necessary to look to the purposes for which the Acts were adopted." [32] As stated briefly above, the courts have long recognized that the purposes of the Natural Gas Act, including section 3, are to "protect consumers against exploitation at the hands of natural gas companies." [33] In other words, Congress' intent was to "afford consumers a complete, permanent and effective bond of protection from excessive rates and charges." [34]

While many cases calling for a review of agency action against this intent relate specifically to the regulatory power, now in the FERC, over the sale price of natural gas in interstate commerce under section 7 of the Act, this court has observed that "[t]he

----

. . . .

Mr. WHEELER. I have no objection to section 3 being stricken out. I think it is rather immaterial.

Mr. BROWN of Michigan. I think so, too.

Mr. WHITE. Mr. President, I move that section 3 be stricken from the bill.

The PRESIDING OFFICER (Mr. THOMAS of Utah in the chair). The question is on the motion of the Senator from Maine.

The motion was agreed to.

81 Cong.Rec. 9312–13 (1937). The House subsequently rejected the Senate Amendment striking section 3 from H.R. 6586, however, and the Senate receded from its amendment without further debate. 83 Cong.Rec. 9146 (1938).

29. *See* p. 855 *infra.*

30. *See* H.R. 11662, 74th Cong., 2d Sess. § 3 (1936); S. 4480, 74th Cong., 2d Sess. § 3 (1936) (italicized language was modified or deleted in the final version):

*TRANSPORTATION TO A FOREIGN COUNTRY*

Section 3. After six months from *the date on which this Act takes effect* no person shall *transport* any natural gas from the United States to a foreign country without first hav-

ing secured an order of the Commission authorizing it to do so. The Commission shall issue such order upon application, unless, after opportunity for hearing *the facts,* it finds that the proposed *transportation would impair the sufficiency of the supply of natural gas within the United States.* The Commission may by its order grant such application, in whole or in part, with such modification and upon such terms and conditions as the Commission may find necessary or appropriate, and may from time to time, after opportunity for hearing, and for good cause shown, make such supplemental order in the premises as it may find necessary or appropriate.

31. *See* note 30 *supra.*

32. *NAACP v. FPC,* 425 U.S. 662, 669, 96 S.Ct. 1806, 1811, 48 L.Ed.2d 284 (1976).

33. *FPC v. Hope Natural Gas Co.,* 320 U.S. 591, 610, 64 S.Ct. 281, 291, 88 L.Ed. 333 (1944).

34. *Atlantic Refining Co. v. Public Serv. Comm'n,* 360 U.S. 378, 388, 79 S.Ct. 1246, 1253, 3 L.Ed.2d 1312 (1959).

Commission has long regarded Section 3's 'public interest' standard and Section 7's 'public convenience and necessity' standard as substantially equivalent."[35] This is not to say, however, that there are not important differences remaining in how the standards are to be applied to actions taken under the respective sections.

Agency authorization is a statutory prerequisite, under section 3, to any importation or exportation of natural gas, just as a certificate of public convenience and necessity is required by section 7 before a party may engage in interstate activity in the industry. Contrary to section 7, however, section 3 sets out a general presumption favoring such authorization, by language which requires approval of an application unless there is an express finding that the proposed activity would not be consistent with the public interest. Section 3 therefore differs significantly from other sections under the NGA which condition agency approval upon a positive finding that the proposed activity will be in the public interest.[36] This distinction was recognized early by the Fifth Circuit in *Cia Mexicana de Gas v. FPC*,[37] which offered the following comparison between the relative standards under sections 7 and 3:

A certificate of public convenience and necessity [under section 7] requires as a condition to its granting that the commission make a positive finding of consistency with the public interest.

An export [or import] permit [under section 3], on the other hand, *must be issued unless the commission makes a negative finding*, and it may not be doubted, that the authority of the commission to grant a . . . permit is certainly as broad as its authority under the certificate section.[38]

Furthermore, that portion of the section which empowers the regulating agency to grant an application "in whole or in part, with such modification and upon such terms and conditions as the Commission may find necessary or appropriate,"[39] affords the ERA an obvious and significant flexibility in its basic approval function.

This court recognized the broad scope of section 3's regulatory authority in *Distrigas v. FPC*,[40] a case involving the FPC's jurisdiction over a company which it had authorized to import Algerian LNG. The contro-

---

**35.** *Distrigas Corp. v. FPC*, 495 F.2d 1057, 1065 (D.C.Cir.), *cert. denied*, 419 U.S. 834, 95 S.Ct. 59, 42 L.Ed.2d 60 (1974).

**36.** An application under section 7, for example, may be granted only if the activity "is or will be required by the present or future public convenience and necessity." 15 U.S.C. § 717f(e) (1976).

**37.** 167 F.2d 804 (5th Cir. 1948).

**38.** *Id.* at 806 (emphasis in original).
Of course, many import or export projects also involve other activities regulated under the NGA, such as the construction of facilities to receive or ship natural gas in interstate commerce, or the sale of natural gas for interstate resale. Thus, the typical applicant under section 3 must also apply for a certificate of public convenience and necessity under section 7.
When the FPC was the only regulatory body involved in administering either section, it commonly consolidated a party's separate applications, reviewing them and deciding upon them jointly, as it did in the first stages of the project involved in this case. *Columbia LNG Corp.*, 47 F.P.C. 1624, 1628 (1972), *vacated on other grounds, Columbia LNG Corp. v. FPC*, 491 F.2d

651 (5th Cir. 1974). There was no need, under this procedure, to separate the issues by section. The FPC had jurisdiction over both and the combination clearly provided the Commission with complete authority to decide the full range of issues presented. *Id.* at 1630–31. As a result, neither the FPC nor reviewing courts had frequent opportunity to address section 3 directly.
Today, however, as one commentator has correctly observed,

the need to trace exactly what is within § 3 authority . . . is essential to understand the division of responsibilities between the Federal Energy Regulatory Commission (FERC) and the Economic Regulatory Administration (ERA) [after the DOE Act and] pursuant to Delegation Order Nos. 0204–1, 0204–25 and 0204–26 from the Secretary of Energy.

Huard, *Regulation of the Importation and Exportation of Natural Gas: A Survey and Analysis of Section 3 of the Natural Gas Act*, 15 J. Int'l L. & Econ. 533, 537 n.24 (1981).

**39.** *See* p. 854 supra.

**40.** 495 F.2d 1057 (D.C.Cir.), *cert. denied*, 419 U.S. 834, 95 S.Ct. 59, 42 L.Ed.2d 60 (1974).

versy in *Distrigas* was rooted in a 1948 case, *Border Pipe Line Co. v. FPC,*[41] in which this court had distinguished "interstate commerce" from "foreign commerce" for purposes of the NGA, and had reversed an FPC finding that a pipeline company located in Texas and exporting gas to a customer in Mexico was subject to the certification requirements of section 7. Although we held in *Border* that the FPC's sole source of regulatory jurisdiction over exported gas was section 3, and thereby rejected the Commission's argument that foreign commerce was to be counted as interstate commerce for purposes of the Act and that a certificate of public convenience and necessity for both the export service and the pipeline facilities involved was necessary under section 7, we did not outline any requirements for review of an application under section 3.

The particular controversy in *Distrigas* arose over the FPC's requirement that Distrigas file for a section 7 certificate to construct and operate LNG import facilities which, unlike the facilities at issue in *Border*, were also linked to interstate pipeline networks.[42] Distrigas argued that the FPC's requirement violated the foreign commerce/interstate commerce distinction made in *Border*, that the Commission had no jurisdiction over the facilities under section 7 and therefore that it could not require a certificate of public convenience. The FPC argued, on the other hand, that "unless its interstate commerce jurisdiction [was] held to extend to all sales of imported

natural gas and the facilities related thereto," there would result "the sort of 'attractive regulatory gap' that Congress intended the Natural Gas Act to fill."[43] It contended that if the *Border* opinion unavoidably contributed to this regulatory gap, it should be overruled.[44]

This court declined to accept the FPC's urgings that *Border's* foreign commerce/interstate commerce distinction should be overruled,[45] but we also rejected Distrigas' position that the Commission had no power to require the certificates. We concluded that the broad authorization under section 3 to modify import authorization as required by the public interest afforded the FPC all the jurisdiction necessary to require certification as it had:

> Under Section 3, the Commission's authority over imports of natural gas is at once plenary and elastic.... [W]e find it fully within the Commission's power, so long as that power is responsibly exercised, to impose on imports of natural gas the equivalent of Section 7 certification requirements both as to facilities and— what we suspect is of more vital concern to the Commission and to petitioners—*as to sales within and without the state of importation.* Indeed, we think that Section 3 supplies the Commission not only with the power necessary to prevent gaps in regulation, but also with flexibility in exercising that power—*flexibility far greater than would be the case were we to hold that imports are interstate com-*

**41.** 171 F.2d 149 (D.C.Cir.1948).

**42.** *See Distrigas Corp.,* 49 F.P.C. 1145, *aff'd,* 49 F.P.C. 1400 (1973).

**43.** 495 F.2d at 1063.

**44.** *Id.*

**45.** Although we recognized that "neither the language nor the legislative history of the Act's interstate commerce definition unambiguously establishes the correctness of the *Border* construction," *id.,* we placed some weight on indications of subsequent congressional approval, as well as significant private reliance upon the distinction:

> Since *Border,* the Commission has asked Congress, on fourteen separate occasions, to

enact legislation overruling it; each time, Congress has refused. Indeed, in 1953, Congress amended the Federal Power Act to include the equivalent of the *Border* interpretation, thus implicitly approving it. Moreover, *Border* has governed Commission regulatory efforts with respect to imports and exports of natural gas for over twenty-five years, and while we cannot gauge from the record and arguments before us the extent to which private concerns have been arranged in reliance on it, that extent may well be considerable. In our view, these considerations must militate strongly against our now holding that *Border* was incorrect.

*Id.* (footnotes omitted).

*merce, automatically and compulsorily subject to the entire panoply of Section 7's requirements.*[46]

Clearly, the use of such power is to be governed by section 3's own standards, rather than those of other sections.

The DOE Act's restructuring of the administrative framework did not alter the flexibility of this statutory authority under section 3. The FPC's broad general power to condition permits as "necessary or appropriate" was transferred to the Secretary of Energy, who included it in his delegation to the ERA.[47] The language of this delegation evidences an anticipation that the ERA might impose conditions which would overlap with areas—such as the pricing structure of natural gas—over which FERC normally would have jurisdiction:

In exercising the functions [of determining whether importation or exportation of natural gas is not inconsistent with the public interest], the Administrator may attach such terms and conditions as he shall determine to be necessary to make the import or export not inconsistent with the public interest, which terms and conditions the FERC shall include in any order it may issue which authorizes the import or export pursuant to Delegation Order No. 0204–26.[48]

The Supreme Court has recognized this need for regulatory flexibility in more general terms:

[An agency] created to protect the public interest must be free, "within the ambit of [its] statutory authority, to make practical adjustments which may be called for by particular circumstances."[49]

---

**46.** *Id.* at 1064 (emphasis added). The record in the matter was therefore remanded to the FPC for supplementation, with directions that the Commission "supply findings and reasons to support its jurisdictional determination under Section 3's public interest standard." *Id.* at 1066.

**47.** Delegation Order No. 0204–25, para. (a)(1)–(5), 43 Fed.Reg. 47,769 (17 Oct. 1978).

**48.** *Id.* at paragraph (b). The language requiring FERC to include in its own authorization any of the conditions placed by ERA upon a particular application affords consistency in what could potentially be conflicting agency actions in the exercise of separate functions under section 3. The ERA is in the principal position of determining whether a particular import or export license would be inconsistent with the public interest—and to modify or condition the application as necessary to avoid that inconsistency. Thus, while its primary jurisdiction is over the authorization in general, the conclusions it may impose may be of a type that would overlap with FERC's functions under other sections of the NGA.

The risk of such a regulatory overlap is lessened in part by the Secretary's delegation to FERC (rather than to the ERA) the power, recognized under section 3 since *Distrigas*, to approve or disapprove the site, construction and operation of particular facilities, as well as the place of entry for imports. *See* Delegation Order No. 0204–06, para. (1), 43 Fed.Reg. 47,-769 (17 Oct. 1978). Order No. 0204–26 also expressly confirms that FERC is to perform "all functions under Sections 4, 5, and 7 of the Natural Gas Act," (which include the normal licensing and ratemaking jurisdiction over nat-ural gas in interstate commerce), even though arising in connection with a section 3 application. However, in obvious anticipation that the ERA might find it necessary to attach an import condition related in some manner to rates or facilities, the language of Delegation Order No. 0204–25 quoted above generally requires FERC to act itself and issue orders consistent with the ERA–imposed terms. The requirement is not absolute, however. There is room for FERC effectively to veto the ERA's conditional grant of an import or export authorization when inconsistent with other aspects of natural gas regulation. Thus, as stated in Delegation Order No. 0204–26, while

[t]his Order does not delegate to the F.E.R.C. authority to authorize an import or export under Section 3 of the Natural Gas Act unless such authorization adopts such terms and conditions as shall have been previously attached by the Administrator pursuant to the authority delegated to him by Delegation Order No. 0204–25, . . . nothing in this paragraph shall require the F.E.R.C. to authorize an import or export under any section of the Natural Gas Act if it determines that the application, as conditioned by the Administrator pursuant to the authority delegated by Delegation Order No. 0204–25, is inconsistent with provisions of the Natural Gas Act which the F.E.R.C. has been delegated authority to administer by this Order or which are otherwise vested in the F.E.R.C.

*Id.*

**49.** *FPC v. Louisiana Power & Light Co.*, 406 U.S. 621, 642, 92 S.Ct. 1827, 1839, 32 L.Ed.2d 369 (1972) (quoting *FPC v. Natural Gas Pipeline Co.*, 315 U.S. 575, 586, 62 S.Ct. 736, 743, 86 L.Ed. 1037 (1942)).

We have found it unnecessary in the past, even as we do now, to attempt to define the precise bounds of this flexibility.[50] Rather, as this court noted in *Distrigas*,

[i]t is for the Commission in the first instance to determine, after reasoned consideration and on the basis of substantial evidence, whether and *in what manner* to exercise its flexible Section 3 power, and this determination will in turn be subject to the normal review processes provided in the Act.[51]

We now arrive at the critical point. The decisive issue here is that the "normal review processes" encompass a determination of whether necessary findings are based on substantial evidence, and whether, in all other respects, the decision was the product of a deliberate and reasonable process. It is to this examination that we now turn.

### C. The Substantial Evidence Requirement of NGA's Section 19

As this court has before stated, it is the concept of "reasoned decisionmaking" that is "in essence the keystone of the Rule of Administrative Law."[52] It is therefore this court's ultimate function, in reviewing administrative decisions, "to assure that the agency has given reasoned consideration to all the material facts and issues."[53] This scrutiny must include, in actions taken under the NGA, a determination of "whether each of the order's essential elements is supported by substantial evidence."[54] While the substantial evidence requirement of NGA section 19(b) does not empower us to criticize the wisdom of the fundamental policy judgments which may underlie an agency's decision, we may, and do, require that an agency rely on more than unadorned assertions that it has exercised its expertise on a particular issue. The findings of fact necessary to the agency's analysis and decision must be supported on the record.

It is apparent, upon considering the ERA's discussion of the many (admittedly difficult) issues raised in its examination of the Amendment Agreement, that *the ultimate rationale for "reauthorizing" imports from the El Paso project was the agency's determination that there was an overall national need, particularly in light of worldwide energy shortages, for increased supplies of natural gas.* It is this conclusion coupled with an obvious concern that the entire project would be jeopardized by any action that would give the Algerian government an excuse to cut off deliveries, which is used to support virtually every element of the ERA's decision, from the approval of a renegotiated contract excusing Algerian performance at lower prices,[55] to its approval of the renegotiated price and escalation

---

**50.** The ERA itself has declined to map the largely hypothetical boundaries of its authority to test applications against public interest or to set conditions upon import/export licenses:

In its opinions and orders the ERA has, for the most part, carefully avoided general statements of authority in even those areas delegated in the first instance to it by the Secretary's delegation orders. Instead, the ERA has defined the scope of its section 3 authority within the context of each application.

Huard, *supra* note 48, at 552.

**51.** *Distrigas Corp. v. FPC,* 495 F.2d at 1066.

**52.** *American Public Gas Ass'n v. FPC,* 567 F.2d 1016, 1029–30 (D.C.Cir.1977), *cert. denied,* 435 U.S. 907, 98 S.Ct. 1456, 55 L.Ed.2d 499 (1978).

**53.** *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 851 (D.C.Cir.1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971).

**54.** *Permian Basin Area Rate Cases,* 390 U.S. 747, 792, 88 S.Ct. 1344, 1373, 20 L.Ed.2d 312 (1968).

**55.** *E.g.:*

The probable result of our insisting on performance of the Initial Contract would be the cessation of gas deliveries under the contract
. . . .
. . . [W]e find that in the circumstances of this case it is not inconsistent with the public interest for the parties to have negotiated a replacement for the Initial Agreement. We base that conclusion primarily on the determination that the initial contract price for this *important supply of natural gas* . . . is so out of line with Sonatrach's costs that it would be unreasonable to expect continued deliveries by Sonatrach.

Op.No. 11 at 15 (emphasis added).

provisions themselves.[56] *It follows from the extent of the agency's reliance on this single conclusion that, if the ERA's finding of a justifying national need is not sustainable on the record, the entire analytical structure of its rationale is without foundation and the decision must fall.*

### 1. The ERA's Finding of "Need"

The ERA admitted in its opinion that, notwithstanding that

[a]ny attempt to evaluate the need for specified volumes of LNG at the proposed increased rate over an 18–20 year period is an attempt at fortune telling, ... it is both necessary and appropriate to evaluate as best we can, particularly for the near future, whether there is a need for this supply of LNG at the increased price.[57]

In previous cases involving the importation of LNG, the DOE/ERA made clear that the "need" necessary to justify approval of a particular project could be established only by a clear showing of *regional need—i.e.,* a need on the applicants' particular pipeline systems that cannot be met by *domestic* gas supplies. Thus, while not ruling out the importation of LNG, the ERA stated in a December 1978 opinion[58] that care must be taken in authorizing any new LNG imports to ensure that the gas supply was clearly necessary to meet domestic gas consumption requirements.[59] The agency described as the *preferred test of regional need* a demonstration that distribution companies would be willing to contract directly for the imported supplies. It expressly rejected as insufficient the companies' showings or projections of contractual obligations to deliver gas:

[W]here regional need is assessed, ERA will look for a demonstration of end-user market need, as opposed to a showing of an interstate pipeline company's contractual obligations to deliver gas. The latter evidence would generally be an unreliable indicator of regional need, insofar as it does not reflect impacts of energy conservation measures, conversion to alternate fuels by low priority customers, and self-help measures taken by end-users and gas distribution companies.[60]

Elsewhere, the ERA noted,

[T]he best test of a particular regional or subregional market for an import is the degree to which gas distribution utilities will directly contract for the proffered gas supplies. Moreover, reliance on decisions by state-regulated entities whose utility obligations tie them directly to consumer and community needs will promote flexibility; whereas *exercising Federal authority to impose the consequences of pipeline companies' LNG purchases on their consumers tends to stifle competition.* Accordingly, ERA maintains a presumption in favor of directly committing imported LNG to state-regulated distribution companies or end-users, unless

---

**56.** The ERA observed that

[t]he fact that Sonatrach has insisted on an escalator provision that ties the price of this LNG to market level prices for import petroleum fuels points up a principal reason why imported LNG should be low on our Nation's list of priorities for incremental supplies of energy. Most of these incremental LNG supplies are produced in countries such as Algeria that produce and sell crude oil in a world market that has recently been characterized by enormous price increases. Given today's market conditions, it is not unexpected that these producing countries would attempt to extract similar price increases for their competing LNG supplies. This, therefore, only demonstrates that these LNG supplies are no more secure, and provide no more protection against exorbitant price increase, than imported oil.

*Id.* at 32.

Nevertheless, it approved of those terms, "based on the *unique circumstances* of this ongoing project." *Id.* (emphasis added).

**57.** *Id.* at 39.

**58.** DOE/ERA Op.No. 3 (18 Dec. 1978), Tenneco Atlantic Pipeline Co., 6 Energy Management, Federal Energy Guidelines (CCH) ¶ 70,103 at 70,539 [hereinafter *"Tenneco"*].

**59.** *See id.* at 70,554–56 & n.24. In that same opinion, the agency categorized several sources of natural gas supply, *the least favored of which* was imported LNG.

**60.** *Id.* at 70,557.

there is a *clear*, overriding national need shown for a different project structure.[61]

In addition, the ERA stated that it must be demonstrated that the imports would not adversely affect the development of proximate domestic supplies, the rapid development of which was described as the highest priority of national energy policy.[62]

The agency gave no indication at the outset of this case that it intended to deviate from this precedent. To the contrary, the only need-related issue included in the ERA's pre-hearing order as "appropriate for submission of evidence at the ... hearing" was obviously regional in nature: "What would be the effects of disapproval of the contract amendment on the applicants, their supplier and customers, and the end-users of this gas supply." [63] *Ultimately, however, the agency's decision was not based on a conclusion that the applicant pipelines needed the LNG. Reliance was placed instead upon a finding, based only upon official notice, that there was a national need for the gas.*

We are not satisfied that this conclusion justifies the ERA's otherwise unexplained break with precedent. The failure of such justification calls into question the reasonableness of its entire decision in this case.

Clearly, the evidence offered in the application proceedings did not establish for each of the applicants a regional need for the LNG, even to the ERA's satisfaction. The ERA noted that "there is no uniformity among the three applicants regarding need for this LNG, according to the evidence in the record." [64] Among the three applicants, only one—Southern—demonstrated any then-current need for the imported LNG. Although Consolidated and Columbia both offered projections that the LNG would be

needed in the future, the ERA concluded that these supply and requirement projections were "likely to have overstated the potential need for LNG due to conservative assumptions regarding availability of gas from domestic sources, ... and a decrease in consumption resulting from increased conservation." [65] In fact, according to the agency itself, *the record showed not only a surplus of available natural gas* but also that the applicants' prior importations of LNG had *restrained domestic gas production.*[66] Consolidated had turned back available domestic gas in quantities equivalent to the LNG it was importing and was decelerating its efforts to develop domestic natural gas from leaseholds in Appalachia and Louisiana.[67] Columbia had similarly turned back relatively inexpensive domestic natural gas from the Southwest and had not availed itself of the opportunity to purchase domestic gas in the intrastate market, despite encouragement from the ERA and FERC that such purchases be made to relieve an *oversupply* that was threatening to shut in domestic gas production.[68]

Not only were projections of delivery commitments from at least Consolidated and Columbia deemed by the ERA to be insufficient to justify the LNG importation, but customer surveys by each of the companies showed a marked *unwillingness* by distribution companies to contract directly for the purchase of the Algerian gas.[69] Under *Tenneco,* the applicants' failure to demonstrate a regional need in the form of a willingness by these companies to purchase the imported LNG directly should have led the agency to deny the application. It did not. In the final analysis, the agency granted the import authority *in spite of* the

61. *Id.* at 70,554–56 (emphasis added).

62. *Id.*

63. Op.No. 11 at 7.

64. *Id.* at 45.

65. *Id.*

66. *See id.* at 45–46.

67. J.A. at 421–22.

68. J.A. at 368–70; 373–74; 387.

69. "The customer surveys on this issue ... indicate an overwhelming preference for continuation of the status quo with regard to rolled-in pricing and a *corresponding opposition to purchasing the LNG under direct contract.*" Op.No. 11 at 50 (emphasis added).

applicants' failure to demonstrate a collective need for the LNG. *It simply substituted for the otherwise required showing of regional need its own finding of a national need for the gas.* The opinion's conclusion on the issue is telling:

[W]hile it has not been shown conclusively that all three of the applicants' systems need these gas supplies at this time, we find that the incremental increase in the total U. S. energy supply as a result of these LNG deliveries is important in fulfilling an overall national need for additional gas supplies, and that these particular supplies will directly or indirectly find their way to regions of the country where a need for additional supplies exists.[70]

Unfortunately, *this finding of an overall national need for additional gas supplies is made without reference to any supporting record evidence.* The agency's opinion states simply that the "realistic conclusion as to the need for this gas" was the result of official notice, which the agency felt "compelled" to take, of "some fundamental features of today's energy situation."[71] Although the opinion does not make clear what "fundamental features" it was officially noticing, it does refer briefly to "the tight international energy supply situation, which may potentially be further exacerbated by recent events in Iran and elsewhere."[72]

We recognize that the expertness of an agency, expressed as official notice or in some other form, may in some instances be an adequate substitute for substantial evidence where this standard applies, as it does here. This has been held to be so, for example, for "judgmental or predictive"

facts where complete factual support in the record for an agency's judgment is not possible.[73] We do not find this principle applicable in this case, however. The finding of national need is so fundamental to the entire posture adopted by the ERA in this case, including its departure from analysis and policy announced in prior cases, that it must be based on identifiable factual evidence.

We are not insensitive to the difficulties inherent in the ERA's decision. The agency was obviously under some time pressures and no doubt proceeded as it did with an eye to the possibility that even a perfectly acceptable contract could be jeopardized— and the entire El Paso project with it—by undue delays in the administrative process. In this context, the apparent haste with which the evidentiary proceedings were held, and even the agency's reliance on its conclusion of national need for the LNG, might have been understandable—perhaps even barely supportable—had the energy situation been as critical as the opinion presumes. There are important indications, however, independent of our 20–20 hindsight,[74] that even at the time of the ERA's deliberation in this case, the national energy picture, particularly that of natural gas, and DOE policy relative thereto were such that they offer no justification for the ERA's hasty, and in many ways haphazard and overly presumptive analysis.

We cannot overlook that the ERA's reliance only on the "fundamental features of today's energy situation" to find a national need for the expensive Algerian LNG *departs* in many ways from DOE policy, evidenced only a year prior, calling for *close evaluation* of proposals to import natural

---

70. *Id.* at 45.

71. *Id.* at 47.

72. *Id.* at 46.

73. *See FCC v. National Citizens Comm. for Broadcasting*, 436 U.S. 775, 813–14, 98 S.Ct. 2096, 2121, 56 L.Ed.2d 697 (1978). *See also United States v. Detroit & Cleveland Navigation*, 326 U.S. 236, 241, 66 S.Ct. 75, 77, 90 L.Ed. 38 (1975); *FPC v. Transcontinental Gas Pipe Line Corp.*, 365 U.S. 1, 28–29, 81 S.Ct. 435, 450,

5 L.Ed.2d 377 (1961) (apparently holding that expertness may in a sense be a substitute for evidence of future facts).

74. Counsel for the applicants admitted at oral argument that the Algerians' decision to cease LNG deliveries under even the renegotiated contract has not adversely affected their supplies of natural gas, due to a continuing gas "bubble" or nationwide surplus.

gas. Although an agency is not necessarily bound to precedent,[75] it is consistent with protecting the public from arbitrary and capricious decisions[76] to require at least a reasonable and contemporaneous justification for departures therefrom.[77] The ERA break with precedent and policy in this case is not sustainable on the record.

Shortly after passage of the National Energy Act,[78] the DOE determined that it was necessary to review and publicize the gas import policy in light of (1) the enhanced development and production of domestic gas expected as a result of the Natural Gas Policy Act,[79] (2) the reduced demand for gas resulting from the prohibitions on gas use under the Fuel Use Act of 1978,[80] and (3) the efforts in gas conservation prompted by higher natural gas prices. This policy was evidenced in two December 1978 opinions denying applications to import LNG.[81] The ERA not only announced that approval of an application to import gas supplies was dependent upon a showing of regional need,[82] but it also required applicants to demonstrate that the imports would not affect the development of proximate domestic supplies.[83]

The ERA sought to distinguish this case from the *Tenneco* decision on grounds that the El Paso project was not new, but had already been authorized by the FPC and substantial investments committed thereto. We agree that the commitments and interests of investors should not be ignored,[84] and that the reliance of customers, if it exists, on an established source of gas might also be made part of the agency's balancing of relevant considerations. However, these factors, inherent as they may be in the ERA's attempt in this case to distinguish precedential decisions merely on the basis that the project was not new, do not satisfy the fundamental inquiry of whether there is a *need* for the gas. The ERA itself admitted that the finding of need made earlier by the FPC was irrelevant to its reevaluation of the import contract;[85] that it had to find that there was still a need for the imported quantities at the higher price.

---

**75.** It is clearly within the ERA's discretion, and consistent with the flexibility inherent in and necessary to its responsibilities under section 3, to depart where appropriate from presumptions and policy defined in prior cases. The logical extreme of denying such discretion would be to bind the administrative process in each case to a formal legal analysis, without regard to any changes in underlying policy or general circumstances. Such an approach would eliminate the important function of considering the practical impact of (and thereby the very "public interest" behind) a particular proposal.

At the other extreme, however, an exercise of unfettered flexibility too often results in *ad hoc* judgments and arbitrary decisions, both of which are counterproductive to the greater regulatory goals of consistency in decisions and reasoned guidance upon which affected parties may rely.

**76.** *See* 5 U.S.C. § 706(2)(A) (1976).

**77.** *See FPC v. Texaco, Inc.,* 417 U.S. 380, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974); *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 852 (D.C.Cir.1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971).

**78.** The National Energy Act is actually a collective name for a complex of five major statutes enacted in 1978: the Public Utility Regulatory Policies Act, Pub.L.No. 95–617, 92 Stat. 3117 (1978); the National Energy Conservation Policy Act, Pub.L.No. 94–619, 92 Stat. 3206 (1978); the Natural Gas Policy Act, Pub.L.No. 95–621, 92 Stat. 3350 (1978); the Energy Tax Act, Pub. L.No. 95–618, 92 Stat. 3174 (1978); and the Powerplant and Industrial Fuel Use Act, Pub. L.No. 95–620, 92 Stat. 3289 (1978).

**79.** 15 U.S.C. §§ 3301 *et seq.,* 42 U.S.C. § 7255 (Supp. IV 1980).

**80.** Powerplant and Industrial Fuel Use Act of 1978, Pub.L.No. 95–620, 92 Stat. 3289 (codified in scattered sections of Titles 14, 42, 45, and 49 U.S.C.).

**81.** *Tenneco,* cited at note 58, *supra,* and DOE/ERA Op.No. 4 (21 Dec. 1978), El Paso Eastern Co., 6 Energy Management, Federal Energy Guidelines (CCH) ¶ 70,104.

**82.** See pp. 31–32 *supra.*

**83.** Rapid development of domestic gas supplies was given the highest priority of national energy policy. *Tenneco* at 70,554–56.

**84.** *See Permian Basin Area Rate Cases,* 390 U.S. 747, 791–92, 88 S.Ct. 1344, 1373, 20 L.Ed.2d 312 (1968) (quoted at p. 853 *supra*).

**85.** Op.No. 11 at 39.

Thus, as far as "need" was concerned the project *was* a new one.

The Secretary of Energy authoritatively reaffirmed the policy approach taken in the *Tenneco* and *El Paso Eastern* decisions in an address on 9 January 1979,[86] stating that close examination of the need for and impact of (LNG) imports was a deliberate and carefully thought-out change from the more permissive attitude that prevailed prior to passage of the National Energy Act. The rationale offered for this shift included language which deprives the ERA of any justification which it might have found even a year earlier in its notice of a critical national energy shortage:

> After the 1973–74 embargo and the natural gas shortage of 1976–77, an attitude of desperation developed with regard to gas supplies which made long-haul, high-cost LNG appear more attractive than was truly the case. The overall cost of LNG may be no lower in the long run than synthetic gas, domestically produced. The balance of payments costs and the potential risks are obvious. . . . LNG has the potential disadvantage of shutting in lower-cost domestic production. Overall this is a prospect markedly less attractive than the others. We should not shut the door to LNG, but we should turn to it only if other, more attractive, lower-cost sources of supply do not materialize.
>
> . . . Above all, we must recognize—as we failed to recognize before the passage of the Natural Gas Policy Act—that we are under no immediate pressure. We have the opportunity to develop our policies intelligently, as uncertainties about domestic supply are reduced, and as our understanding about prices and availability of alternative supplies is enhanced.[87]

The Secretary thus attached little continuing importance, as a matter of policy, on a worldwide energy shortage. In fact, he described as "essential" a goal of ridding the national market of a short-term natural gas *surplus* of one trillion cubic feet, brought about in large part by the Natural Gas Policy Act, in order to prevent a "dampening effect on incentives" for domestic production.[88]

We do not purport to offer these observations as dispositive of the issue of national need. We intend by our reference to the Secretary's statement only to demonstrate that, even if official notice might have properly been taken of the tight energy markets of the 1970's, this notice alone was an inadequate substitute for the substantial evidence upon which the ERA's finding of national need—which provided the binding thread to the whole of its rationale for approving the Amendment Agreement—should have been based. The issue of national need was not even included in the prehearing order and the agency gave no indication whatsoever that it would take official notice of the matter. There was therefore no offering of evidence by any party on either side of the issue of national need.[89] It is not a matter of the *weight* of

---

**86.** Remarks by Secretary James R. Schlesinger before the National Association of Petroleum Investment Analysts and the Oil Analysts Group of New York (9 Jan. 1979), *reprinted in* Department of Energy, Office of Public Affairs, *Information*, 1–3 (1979) (hereinafter "Address"). The Secretary stated that the decisions represented considered policy "long in the making," which DOE chose to announce in those cases rather than through rulemaking. *Id.* at 2.

**87.** *Id.*

**88.** *Id.* at 3.

**89.** The ERA's argument that it committed no error in taking official notice as it did, because it could have granted the applications without a hearing anyway, is unavailing. In making this argument, the ERA has overlooked its own determination that an evidentiary hearing was required by due process, even if not necessarily by the statute. Op.No. 11 at 6. It is a meaningless gesture to afford such a hearing if the agency does not consider itself confined to the evidence adduced therein. If the circumstances require that the agency take official notice of material facts, it must afford an opportunity for the parties to present information "which might bear upon the propriety of noticing the fact, or upon the truth of the matter to be noticed." C. McCormick, Law of Evidence § 333, at 771 (2d ed. 1972). In fact, the APA requires that when an agency decision rests on official notice, a party be given "on timely request, . . . an opportunity to show the con-

the evidence; there was simply *no* record evidence to weigh.

It is apparent that the agency simply moved too quickly on the issue of need—evidencing more an attitude of desperation than the careful examination and judgment which this key issue required.

### 2. *"National Need" and "Public Interest"*

The lawfulness of the ERA's reliance on a broad national need for increased quantities of natural gas is questionable for reasons other than the failure of substantial evidence. As noted at the outset of our analysis, the ERA's regulation of natural gas imports or exports is limited—as well as guided—by a standard of a consumer-based "public interest." It is true that the ultimate standard is *consistency with*, and not necessarily direct service to, this "public interest," and we do not suggest that the ERA necessarily acted outside its statutory power in attempting to satisfy what it perceived to be a broad national interest in greater supplies of natural gas. Certainly there is a broad range of factors besides the ultimate costs to the consumers which must play a part in the ERA's decisions on import applications. These factors include the security of supply, effects on U. S. balance of payments, and national and regional needs, as well as costs.[90] Nevertheless, the delicate balance which must be struck among these several factors does not excuse the basic standard. The very fact that it is in a position to make energy policy and decisions which may impact on broad international relations and economics, or on national interests other than consumer welfare within limited geographic areas, makes it even more important for the ERA to keep at least one eye upon the consumers likely to be affected by a proposed action. That does not mean that the consumers' interests must always prevail. But they must be recognized. There is every indication that this class was ignored altogether in this case.

Inherent in the ERA's conclusion that the El Paso LNG would satisfy a national—even if not a regional—energy need, was a presumption that the domestic natural gas turned back by the pipelines purchasing the imported LNG under the Agreement would naturally find its way into areas where there was a need for the natural gas.[91]

Although the argument is raised by intervenor PCM and others that this presumption is unsupportable on the record,[92] we find greater fault in the ERA's failure either to acknowledge or to justify the effect that the substantial price increases under the new import authorization would have

trary." 5 U.S.C. § 556(e) (1976). No such opportunity, which could have come only after the order was issued, since official notice was first taken in the opinion, was afforded in this case.

**90.** *See* Delegation Order No. 0204–54(a), 44 Fed.Reg. 56,735 (2 Oct. 1979).

**91.** The ERA put great weight on a further presumption that incremental energy needs would be met with this "turned back domestic gas which would otherwise be filled by imported crude oil or petroleum products." Op.No. 11 at 46. The agency offers no basis for this presumption, and we find none on the record. In fact, the agency admitted in its opinion that "[n]one of the three applicants provided significant evidence concerning displacement of crude oil or petroleum products by the importation of this LNG." *Id.* And, in a rulemaking proceeding undertaken at the same time it was considering the El Paso application, the ERA

concluded that excess deliverability of *domestic* gas threatened to shut in domestic gas production. *See* 44 Fed.Reg. 1694 (5 Jan. 1979). Logically, loading imported gas onto the market would only exacerbate the gas glut and its tendency to stifle the much preferred domestic production. The effect, with which the ERA's decision fails to come to grips, would be that committed LNG imports would substitute, not for imported oil, but for less costly domestic gas. There is evidence on the record that this result was more than merely theoretical. Columbia and Consolidated both admitted that domestic production, including leasehold acquisition and development, had already been affected by the LNG. *See* Op.No. 11 at 44; also J.A. at 418–21.

**92.** *See, e.g.*, Brief of Intervenor People's Counsel of Maryland at 55–56.

on consumers within at least the Consolidated and Columbia systems.[93]

Even if we were to adopt the presumption that domestic gas displaced regionally by the imported El Paso LNG would then be made available to meet needs in other areas, the consumers ultimately benefitted by this turn-back—*i.e.*, those who actually need the gas—would bear none of the economic burden of the increased costs of the imports. *The ERA's decision thus has the highly inequitable effect of imposing the full cost of the expensive imported gas, not upon those who actually need the increased supplies, but upon consumers in areas where cheaper domestic gas is available.* The ERA's attention to a broad "national interest" simply caused it to ignore its ultimate responsibility to a geographically narrower "public interest."

In short, the ERA seems to have taken significant liberties with the consuming public in order to preserve the El Paso project, no doubt concerned for the extensive investments made. Of course, the fact of considerable American investment should not be ignored. It is possible, at least in the hypothetical instance, that the amount of the potential loss of investment in such a massive undertaking as the El Paso project, a portion of which may be passed on to consumers in the form of certain fixed costs,[94] may, when added to any adverse effects of losing the supply itself, exceed the burden on those same consumers of increased commodity costs. But if this is to be the rationale for a decision to salvage a project by meeting the supplier's demands, then the agency must say so, and justify it. The potential burdens of project failure are noted in the agency's opinion, but no comparison of these costs with the burdens of increased natural gas prices resulting from

the ERA's approval of the renegotiated contract is ever offered.

## III. CONCLUSION

Parties challenging the ERA's decision in this case have raised many more issues than we have addressed in this opinion. It is unnecessary for us to answer all questions raised to determine that the agency's order cannot stand on the justification offered in the lengthy opinion. Except to the extent that the ERA has relied on national energy needs, its departure from precedent and prior natural gas policy are unexplained. And to the extent that findings of a national need for the imported LNG are necessary to the decision, it is not supported by substantial evidence. Although the ERA did not exactly rubberstamp the amendment to the import contract, it also did not give the scrutiny to it which the situation required. It simply failed to put the parties to their proof, especially as to what the true supply situation was in this country in 1979. The agency simply moved too quickly, and did so at a time when such haste was unnecessary. The ERA is bound under section 3 to protect the American consumer and there is little evidence that it did so in this case.

Although we vacate the ERA's order in this case, we expressly offer no opinion as to the ultimate rights of the consumers who have challenged the agency's action. Were it not for the fact that deliveries at the increased prices under the amended contract were actually made over a three-month period in early 1980, this case would clearly have been mooted by the Algerians' subsequent refusal to honor even the amended contract. There is no doubt among the parties that any new supply contract resulting from government-level negotiations now underway will require a new application to and full examination by

---

**93.** Southern arguably demonstrated some shortages on its system—but even there, it demonstrated no willingness among distributors to whom it supplied gas to contract directly for the more expensive LNG.

**94.** Pursuant to the "Minimum Bill" provision of the LNG importers' tariffs, previously approved

by the FPC, the consumers on the applicants' affiliated pipelines must pay certain fixed costs of the U.S. facilities in the event of a termination of LNG deliveries. *See* Op.No. 622–A, Columbia LNG Corp., 48 F.P.C. 723, 730–81 (1972).

the ERA.[95] The only question awaiting resolution of this case is whether or not the affected consumers are entitled to a refund of "excessive charges" paid for gas delivered between January and April 1980. This issue may now be directed by proper procedure to the appropriate agency.

*Order Vacated and Case Remanded.*

---

**95.** As of 16 December 1980 the ERA adopted a system, as yet untested in the courts, under which it first permits government-to-government negotiations to resolve as many issues as possible. Only after these discussions are concluded will the ERA then issue, and open for public comment, a proposed order and opinion. DOE/ERA Order Suspending Consideration of Import Cases Pending Outcome of Inter-Governmental Discussions, Northern Natural Gas Co., Docket No. 79-24-NG at 3-4 (16 Dec. 1980).